Major TILLERY, Victor Hassine, Kenneth Davenport, William Grandison, Nelson Charles Mikesell, and Ellis W. Matthews, Jr., Plaintiffs,

v.

David OWENS, Jr., in his official capacity as the Commissioner of the Pennsylvania Department of Corrections, George Petsock, in his official capacity as the Superintendent of the State Correctional Institution at Pittsburgh, and Arnold Snitzer, M.D., in his official capacity as a member of medical staff of the State Correctional Institution at Pittsburgh, Defendants.

Civ. A. No. 87–1537.

United States District Court,
W.D. Pennsylvania.

Aug. 15, 1989.

As Amended Sept. 8, 1989.

Jere Krakoff, Ed Koren, Nat. Prison Project, American Civil Liberties Union, Michael Antol, Neighborhood Legal Services, Edward Feinstein, Pittsburgh, Pa., for plaintiffs.

Kenneth J. Benson, Deputy Atty. Gen., for defendants.

FINDINGS OF FACT, CONCLUSIONS
OF LAW AND OPINION

COHILL, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .......................................... 1259
II. THE STATE CORRECTIONAL INSTITUTION AT PITTS-
 BURGH ................................................. 1260
III. STATE PRISONERS AND THE UNITED STATES CONSTITU-
 TION ................................................... 1260
 A. *The Role of the Courts* ................................. 1260
 B. *The Scope of the Court's Authority* ...................... 1261
IV. OVERCROWDING.......................................... 1262
 A. *Findings of Fact*....................................... 1262

1. Synopsis ............................................. 1262
2. Description of Facilities ............................. 1262
3. Environmental Conditions ........................... 1264
 a. Generally .................................... 1264
 b. Cleaning Supplies ............................. 1264
 c. Mattresses ................................... 1265
 d. Ventilation .................................. 1265
 e. Lighting .................................... 1265
 f. Plumbing ................................... 1266
 g. Shower Facilities ............................. 1266
4. Effects of Overcrowding ............................. 1267
 a. Double-celling ............................... 1267
 b. Recreational Facilities ........................ 1268
 c. Dining, Laundry Service and Clothing Supplies ...... 1269
 B. *Legal Analysis* ..................................... 1269
 1. Cell Size ..................................... 1270
 2. Cell Conditions ............................... 1271
 a. Ventilation .................................. 1271
 b. Lighting .................................... 1271
 c. Sanitation ................................... 1271
 3. Showers ..................................... 1271
 4. Food Service ................................. 1272
 5. Time in Cell ................................. 1272
 6. Double–Celling ............................... 1272
 C. *Remedy* ......................................... 1273
V. INMATE SECURITY ................................... 1274
 A. *Findings of Fact* ................................. 1274
 B. *Legal Analysis* ................................... 1275
 C. *Remedy* ......................................... 1277
VI. FIRE SAFETY ....................................... 1277
 A. *Findings of Fact* ................................. 1277
 B. *Legal Analysis* ................................... 1279
 C. *Remedy* ......................................... 1280
VII. ACCESS TO THE COURTS ............................. 1280
 A. *Findings of Fact* ................................. 1280
 B. *Legal Analysis* ................................... 1281
 C. *Remedy* ......................................... 1284
VIII. HEALTH CARE ....................................... 1284
 A. *Findings of Fact* ................................. 1284
 1. Mental Health ............................... 1284
 a. Psychiatric Staff ............................. 1284
 b. Psychological Staff ........................... 1285
 c. Psychiatric Nurses ........................... 1285
 d. Psychiatric Social Workers ..................... 1285
 e. Recommendations ............................ 1286
 f. General Conditions Affecting Psychiatric Care ....... 1286
 g. Specific Conditions Affecting Psychiatric Care ....... 1288
 2. Medical Services ............................. 1290
 a. Staffing .................................... 1290
 b. Medical Services Requirements ................. 1292
 1) Administration ............................ 1292
 2) Intake Evaluation ......................... 1294
 3) Sick Call ................................ 1294
 4) Specialty Care ............................ 1295
 5) Infirmary Care ............................ 1295
 6) Medications .............................. 1296
 7) Emergency Services ........................ 1297
 8) Miscellaneous Services ..................... 1297
 c. Specific Medical Cases ........................ 1298
 3. Dental Services ............................... 1301

B. *Legal Analysis* ........................................ 1301
C. *Rx* ..................................................... 1302
 1. Psychiatric Services ............................. 1302
 2. Medical Services ................................. 1304
 3. Dental Services ................................. 1309
IX. PRISON MONITOR ...................................... 1309
X. CONCLUSION .......................................... 1309

## I.

### INTRODUCTION

This Section 1983[1] class action challenges the constitutionality of the conditions of confinement at the State Correctional Institution at Pittsburgh ("SCIP") located in Pittsburgh, Pennsylvania (often referred to locally as "Western Penitentiary"). Plaintiffs are inmates at SCIP. Defendants, officials employed by the Commonwealth of Pennsylvania in various capacities, are generally responsible for operating SCIP.

We began this inquiry on May 3, 1989, with an unannounced and comprehensive four-hour tour of the SCIP facility, accompanied by SCIP officials, the parties' attorneys and two of the named inmate plaintiffs. We then conducted a bench trial from May 4 to June 8, 1989, during which 42 witnesses testified and over 600 documents were admitted into evidence. All parties were zealously represented by well-qualified counsel who performed admirably throughout.

Based on the evidence, and our own first-hand observations, we find that nearly every aspect of SCIP which we consider here is inadequate, falling far below constitutional standards. In fact, crediting the opinions of the expert witnesses who testified, particularly those of the fire protection engineer, medical doctor and penologist retained by plaintiffs, we might very well order that SCIP be closed immediately; it is an overcrowded, unsanitary, and understaffed fire trap. We are painfully aware, however, and take judicial notice, that there is nowhere else in the Commonwealth to house these inmates.

The appellate court cases in this area continuously warn the district courts to avoid judicial incursions into the day-to-day administration of penal institutions. *See e.g., Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979).

We believe that in the lengthy findings and Opinion which follow here we will elude this pitfall by placing the burden on the parties to create their own solutions to the unconstitutional conditions at SCIP.

We likewise are aware that the enormity of the problems will not permit easy, quick or inexpensive solutions. Therefore, it is our intention to attempt here to erect constitutional guideposts for the parties. Defendants will then be given until December 1, 1989 to devise a plan for bringing SCIP into constitutional compliance in cooperation with both counsel for plaintiffs and a prison monitor to be appointed by the Court.

We will first attempt to describe the SCIP facilities, next recite the legal standards governing our review of the conditions of confinement and finally determine this Court's authority to order remedial measures. The remainder of the Opinion sets forth our findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure, and attempts to plant the constitutional guideposts for the consideration of the parties.

---

1. Section 1983 of Title 42, United States Code, reads in part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

42 U.S.C. § 1983

## II.

### THE STATE CORRECTIONAL INSTITUTION AT PITTSBURGH

SCIP, an antiquated correctional facility more than 100 years old, was built on the banks of the Ohio River on approximately 14 acres of land within the City of Pittsburgh. A maximum security prison, it houses serious offenders serving terms from two years to life or sentenced to death. The prison is a complex of numerous large buildings surrounded by a stone wall measuring approximately 30 feet high and 4 to 5 feet thick.

The main facilities housing inmates are the cavernous North and South cell blocks. The North Block was constructed in 1882 and the South Block in 1888.

The Rotunda, a circular building, connects the North and South Blocks. It houses SCIP administration offices, inmate storage rooms, a records storage area, and an employee dining facility.

Additional inmate housing, located in the newer A and B Blocks was constructed in 1986. The entire B Block and part of the A Block contain administrative and housing facilities for the Western Diagnostic and Classification Center ("Clinic"). The Clinic, which houses 494 inmates, is a reception, diagnostic and assignment facility. All inmates sentenced to serve in the Pennsylvania correctional system are first sent to the Clinic for screening, following which they either remain at SCIP or are sent to other Pennsylvania penal institutions.

The A Block also houses capital case (death sentenced) inmates, inmates who have been placed in disciplinary or administrative segregation, and self-lockup inmates. Disciplinary custody inmates are those housed away from the general population for punitive reasons. Those segregated due to the administration's fear that they may harm themselves or others are said to be in "administrative segregation."

Self-lockup inmates are those who have voluntarily chosen to live in segregated housing for their own reasons.

Other buildings on SCIP grounds house the inmate dining facility, prison industry and workshop facilities, the infirmary, the law library, the auditorium, the gymnasium and the powerhouse.

## III.

### STATE PRISONERS AND THE UNITED STATES CONSTITUTION

#### A. *The Role of the Courts*

United States citizens sentenced to confinement as punishment for criminal activity do not lose the protections afforded them by the United States Constitution. The eighth amendment to the Constitution prohibits the infliction of "cruel and unusual" punishments upon citizens.[2] This prohibition applies not only to the federal government but also to the states in their operation of state penitentiaries. *Whitley v. Albers,* 475 U.S. 312, 318–19, 106 S.Ct. 1078, 1083–84, 89 L.Ed.2d 251 (1986).

■ Certainly, states are not obliged to house their prisoners in a country club-like environment with all of the luxuries of twentieth century life; incarceration necessarily entails the withdrawal or limitation of rights and privileges. *Hudson v. Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984). "To the extent that [prison] conditions are restrictive and even harsh they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Thus, sentenced inmates may be required to live under punitive conditions so long as those conditions are not cruel and unusual. *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979).

---

**2.** The Eighth Amendment to the United States Constitution provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

But the eighth amendment prohibits punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime, or are "totally without penological justification." *Id.*

A court faced with the responsibility of drawing the line between constitutional and unconstitutional conditions undertakes a delicate task. No static test determines whether conditions of confinement are "cruel and unusual." These terms must "draw [their] meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399. This analysis should not be subjective. Rather, the court's judgment must be "informed by objective factors to the maximum possible extent." *Id.*

The role of the courts, then, is to enforce constitutional standards and to protect the constitutional rights of prisoners. *Ruiz v. Estelle,* 679 F.2d 1115, 1126 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). But this role does not include "second-guessing prison administrators or supervising prison administration," *Id.* at 1126, or becoming "enmeshed in the minutiae of prison operations." *Wolfish,* 441 U.S. at 562, 99 S.Ct. at 1886. Prison administration must be left to the discretion of prison administrators.

With these rules or guidelines in mind, we have concluded that the inmate living conditions at SCIP are cruel and unusual by twentieth century standards and are, therefore, unconstitutional. Accordingly, we will order the defendants to present a plan to remedy the situation.

B. *The Scope of the Court's Authority*

What are the parameters of the court's remedial authority?

The eleventh amendment to the United States Constitution provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This amendment denies federal courts authority to entertain a suit brought by private parties against any state without its consent. *Ford Motor Co. v. Dept. of Treasury of State of Indiana,* 323 U.S. 459, 462, 65 S.Ct. 347, 349, 89 L.Ed. 389 (1945). *See also Will v. Michigan Dept. of State Police,* —— U.S. ——, ——, 109 S.Ct. 2304, 2307, 105 L.Ed.2d 45 (1989) (a state is not a "person" within the meaning of Section 1983 and may not be sued under that statute).

While suits against the state itself are thus barred, suits against state officials allegedly acting in violation of the Constitution are not. A suit alleging a violation of federal law strips a state officer of his official authority and is therefore not considered to be an action against the state. *Ex parte Young,* 209 U.S. 123, 159, 28 S.Ct. 441, 453, 52 L.Ed. 714 (1908).

An unconstitutional act is "void" and therefore does not impart to the officer immunity from responsibility to the supreme authority of the United States. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984). Since the state could not authorize the action, the officer, considered to be stripped of his official character, is subjected in his person to the consequences of his individual conduct. *Id.* Therefore, when sued for injunctive relief, a state official is a "person" under Section 1983 because suits for prospective relief brought against those acting in their official capacity are not treated as actions against the state. *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985).

This somewhat convoluted legal process really means that once a plaintiff shows that a state official's actions have violated the Constitution, the court can indirectly reach the state—"the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). Thus, the

Court can reach the Commonwealth through the named defendants in this case.

■ However, the court can order only relief sufficient to correct a violation. In prison cases the remedy must be tailored to correct the underlying cruel and unusual conditions. *Ruiz v. Estelle,* 679 F.2d 1115, 1144–45 (5th Cir.1982). The remedy should seek to place victims of unconstitutional conduct in the position that they would have occupied in the absence of such conduct. *Milliken v. Bradley,* 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977).

We recognize that remedies to rectify identified constitutional violations must be crafted with extraordinary sensitivity and restraint. The Constitution establishes a delicate balance between federal and state governments and between courts and legislatures. "Especially in the area of prison administration, judicial restraint is necessary in order to ensure that the business of operating a state correctional system stays in the hands of persons most able to accomplish this difficult task." *Union County Jail Inmates v. Scanlon,* 537 F.Supp. 993, 1009 (D.N.J.1982).

The degree of the district court's equitable discretion is proportionate to the remedial cooperation the court has received. "[T]he equitable powers of federal courts are at their broadest only after state officials default in their obligation to remedy constitutional wrongs." *Inmates of Occoquan v. Barry,* 844 F.2d 828, 843 (D.C. Cir.1988). Accordingly, we will refrain, at this time, from imposing far-reaching or highly intrusive remedies so long as defendants do not abdicate the remedial responsibilities we impose.

■ While a federal court may not award monetary damages when the awards will be paid out of a state treasury, *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974), it may impose declaratory or injunctive relief, *Helfrich v. Pennsylvania Dept. of Military Affairs,* 660 F.2d 88, 90 (3d Cir.1981). Although a court's equitable remedies may implicate state funds, that does not bar the court's exercise of its equitable jurisdiction.

*Hutto v. Finney,* 437 U.S. 678, 690, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978).

Thus, we may impose on the defendant officials any declaratory or injunctive relief that we believe will correct the unconstitutional confinement conditions at SCIP so long as that remedy is narrowly tailored to mend the violation.

## IV.

## OVERCROWDING

A. *Findings of Fact*

1. Synopsis

SCIP has been severely overcrowded since 1982, the year the institution began double-celling inmates. George Petsock, Superintendent of SCIP, testified that he instituted a policy of double-celling in 1982 because the prison lacked bed space for the increasing inmate population. Although originally conceived as a temporary system of voluntary double-celling, by 1983, the inmate population was growing so rapidly that the institution switched to permanent involuntary double-celling.

For example, when SCIP began compulsory double-celling in January 1983, approximately 272 inmates were double-celled. By 1988, that number had climbed to 722, and thus far in 1989, the number of double-celled inmates has soared to 1182. The overall inmate population at SCIP continues to expand, having reached a high of 1802 inmates on June 6, 1989. Sadly, SCIP is a classic example of the severe prison overcrowding crisis plaguing not only the Commonwealth of Pennsylvania, but the entire Country. David Owens, Commissioner, Pennsylvania Department of Corrections, testified that during 1989, 250 more prisoners were entering the penal system each month than were being released. The consequences of this sort of onslaught are obvious.

2. Description of Facilities

SCIP, the oldest prison in Pennsylvania, was designed and built during the late 1800's. It is a classic example of pre–

1900's correctional architecture with multi-tier interior cells. Although originally planned to house one inmate each, most of the cells now contain two beds, one above the other. On June 6, 1989, approximately 1182 of the 1802 inmates living at SCIP were double-celled.

The North and South Blocks provide beds for 1140 inmates. Each block contains 5 tiers, surrounded by a perimeter floor walk space; the tiers rise 50 or 60 feet in the center of the building. The North Block measures 412 feet in length, it has 5 tiers containing 640 cells with 4 separate ranges on each tier. Each range, divided at the center by walkways running the length and width of the tiers, contains 32 cells.

The South Block contains 500 cells in 5 tiers, each measuring 430 feet in length. These tiers are divided by walkways into 4 ranges of 25 cells each.

The cells on each tier are back-to-back with an alley-way between for pipes and utility conduits. This is referred to either as a "pipe chase" or "chaseway." Both cell blocks contain a guard post at one end and an unenclosed shower facility at the other end. Each block has 2 doors for ingress and egress.

In 1986, the Commonwealth constructed A and B Blocks near the North and South Blocks to serve as a restrictive housing unit and to house death-sentenced or *capital* inmates. Level 1 of A Block houses administrative and disciplinary custody inmates; Clinic inmates live on level 2; and capital inmates reside on level 3. B Block also has 3 levels; general population inmates reside on levels 1 and 3, and Clinic inmates live on level 2.

The new building contains 480 cells; the first two levels of A and B Blocks have 96 cells per level, and the third level of each block has 48 cells. Ironically, the 48 cells on level 3 of B Block currently are vacant due to a staffing shortage. The Blocks were originally designed for 768 inmates, 480 in single cells and 144 in double cells. However, as of June 6, 1989, approximately 762 inmates resided in Blocks A and B; 666 of them were double-celled. Plaintiffs

have not complained about the condition or size of these newer cells.

Of the 640 cells in the ancient North Block, 560 measure 8 × 7 or 56 square feet ("large cells"), and 80 measure 6 × 6+ feet or 39 square feet ("small cells"). Four of the cells are used as supply closets. Like Level 3 of B Block, the top 3 tiers of North Block are empty due to inadequate staff. Superintendent Petsock testified that he ordered those tiers to be evacuated in anticipation of new housing construction. However, the construction has not begun. Consequently, of 636 available cells, the inmates occupy only 273.

Although some inmates residing in the North Block are occasionally double-celled in both the large and small cells, most inmates are single-celled. Indeed, as of June 6, 1989, no inmates lived in double cells in the North Block.

All 500 cells in the old South Block measure about 8' × 7' or 56 square feet. Two of these cells are used as supply closets. The majority of the inmates are double-celled. Currently, approximately 741 inmates reside in the South Block, 516 of whom are double-celled. The North and South Blocks combined have a total of 1134 available cells. However, because of inadequate staff, approximately 1014 inmates were cramped into 756 cells as of June 6, 1989.

A thinly barred door provides access into each cell in the North and South Blocks. Small windows are situated above and to the left of the door. A typical single cell is equipped with a small commode, a sink with hot and cold running water, a bed, a desk, a shelf, an unprotected electrical outlet and at least one footlocker.

The double cells differ insofar as they are furnished with two steel frame bunk beds, one above the other, and two footlockers. Inmates can store personal belongings only on the small wall shelf and under the lower bunk. As a result, many inmates store their possessions in the small aisle separating the bunks from the opposite wall, or on a homemade clothes line strung across the cell. In addition to ob-

structing the walkway and restricting movement, articles hanging from the clothes line impede what little airflow enters the cells.

Because these shared cells are so tiny, only one inmate at a time can stand in the cell; the other must lie on the bed. No cell has room to permit physical exercises. The usable, unobstructed space in the 56 square feet cells amounts to approximately 23 square feet, or 11½ square feet per inmate. In the 39 square foot cells, the unobstructed space equals roughly 15 square feet. Basically, inmates in either the small or large cells can do little more than lie or sit on their bunks or desk.

During our inspection tour I entered one of the small double cells. I was unable to turn around once inside it and had to back out. Although some SCIP officials asserted that inmates spend little time in their cells, thus minimizing the hardship from overcrowded living quarters, testimony from inmates and other officials revealed otherwise. Approximately 1026 inmates hold regular prison jobs. Nevertheless, these inmates, most residing in the North and South Blocks, spend approximately 14 hours per day in their cells.

Moreover, some inmates in the North Block require administrative segregation and, consistent with that status, must spend 21–22 hours per day in their cells. Lieutenant James McFetridge, SCIP Housing Officer, testified that he has previously double-celled administrative segregation inmates in both the large and small cells for as long as 4 consecutive weeks.

SCIP plans to build new housing for the inmates, but a "Catch–22" situation exists. The construction plan envisions evacuating and gutting the North Block and demolishing the prison industries building. The plan then calls for locating prison industries in the renovated North Block and constructing a new housing unit at the current prison industries site. Thus, implementation of the plan is hindered by a reverse-domino effect; one phase cannot be started until the preceding phase has been completed. As such, the initial phase requires a complete evacuation of the North

Block, and the current glut of inmates makes this impossible.

Superintendent Petsock testified that he had originally evacuated the top tiers of the North Block in anticipation of this plan, and he continues to keep the top tiers empty, hoping that the construction will begin. However, both Commissioner Owens and Superintendent Petsock testified that the plan essentially has been shelved because of the unprecedented surge in inmate population and the concomitant inability to evacuate the North Block entirely. Thus, the rising inmate population undercuts any realistic expectation of implementing the construction plan which, ironically, was designed to alleviate overcrowding.

### 3. Environmental Conditions

#### a. *Generally*

Age and overcrowding have taken their toll on the physical facilities in both the North and South Blocks, resulting in deplorable environmental conditions. The cell blocks are filthy, dingy and dimly lit. The individual cells are dirty, decrepit and unsanitary. Robert W. Powitz, Ph.D., plaintiffs' expert in environmental health, testified that dirty walls and floors, and the collection of garbage and filth, provide breeding places for vectors and encourage the growth of disease-causing micro-organisms.

Depending on the individual inmate's hygienic habits, the level of sanitation varies within each cell. No housekeeping plan or adequate supervision of general housekeeping exists; thus, the inmates have sole responsibility for cell sanitation. Mentally ill inmates housed in the North Block substantially affect sanitation within the cell because many of these inmates refuse to clean themselves or their cells. Moreover, when a cell is vacated, no terminal cleaning is done prior to the inmate's reassignment. Plaintiffs' Exhibit 673 at 9.

#### b. *Cleaning Supplies*

In addition, the institution does not provide adequate cleaning supplies, thus making cleaning virtually impossible. Mop heads are never cleaned; rather, they are

discarded only when they get too crusty. Brooms are in short supply. Because inmates have few cleaning supplies, and available utensils are so dirty, they do little more than spread the filth around the cell.

### c. *Mattresses*

Endemic bed bugs occupy the institution, particularly in the North and South Blocks. The cotton-covered mattresses, infested with bed bugs, cannot be cleaned, and in fact, are not sanitized between users. This poses a health danger whereby respiratory or enteric diseases can be transmitted to inmates who are required to sleep on the soiled mattresses. However, SCIP is now distributing new mattresses to the inmates. Testimony of Harry Steigman, Defendants' expert on Environmental Health.

Besides being soiled and dirty, the torn and damaged mattresses provide shelter for disease-carrying insects, such as mites, fleas and lice. In addition, the North and South Blocks are infested with mice. Corrections Officer Michael O'Toole testified that more than 100 mice had recently been trapped in the North Block.

### d. *Ventilation*

In winter, the common areas of the tiers are ventilated with forced air; during summer open windows provide ambient air. To open the higher windows, corrections officers must push them with a pole, sometimes breaking them. Inmates also break the windows by throwing objects at them in an effort to ventilate the cell blocks.

Numerous broken windows without window screens enable a significant bird population to nest in the pipe chases and to drop feces on the floors and railings of the tiers. At times, the waste material from birds has been so dense that it has virtually covered the cell block windows. The bird feces pose significant health risks because they can transmit a number of serious diseases to humans. According to Dr. Powitz, the aggregate bird population in the cell blocks spans several generations of birds. Our inspection of the cell blocks revealed a pseudo-aviary with sparrows chirping constantly and flying freely through the dimly lit corridors of the cell blocks.

Like the level of sanitation, the physical facilities in the cells are atrocious. The blocks lack operating systems to assure adequate air movement. Indeed, Dr. Powitz conducted ventilation tests in six cells and discovered a paucity of air movement in those cells. Although each cell was originally equipped with a vent, these were, at some time in the past, filled with cement. Moreover, operable fans installed in the cell block ceiling are not used to exhaust air or to provide any type of air circulation.

Defendants' expert environmentalist, Harry Steigman, agreed with Dr. Powitz that the ventilation in the cells is wholly inadequate, and commented that open windows on a breezy day provide the only source of air in the cells.[3] The insufficient ventilation system not only significantly increases the risk of transmission of airborne diseases, but also results in excessive odors, heat and humidity.

Likewise, both Dr. Powitz and Mr. Steigman noted that the cell blocks lack systems to control the temperatures and humidity. Windows without exterior window shades or any method to exclude solar radiation on hot days permit unbearable temperature levels. During the winter months, the cells are cold and drafty due to the chronically broken windows. However, each cell block is equipped with two large air-moving units which heat the facility during the winter months. According to both experts, if the windows are closed and in relatively good repair, the heat distribution in the cell blocks is adequate.

### e. *Lighting*

Cell lighting is wholly inadequate in the double cells. Only one double lamp fluorescent unit is mounted above the upper bunk. The inmate controls the on/off switch, located outside the cell, from inside by pulling on a string.

Inmates have created a fire hazard by covering the bare lights with shades con-

---

**3.** The court particularly appreciated the frank testimony of Mr. Steigman and Dr. Powitz. It was refreshing to hear experts from opposing sides in a case able to agree on matters important to the case.

structed from waxed milk cartons. Although the light, measuring approximately 40 footcandles, is sufficient for the upper bunk, the lower bunk receives no direct light at all. In fact, Dr. Powitz measured the intensity of the lower bunk illumination at less than 1 footcandle.

The desk lighting, measuring only 7 footcandles, is also inadequate. Consequently, an inmate occupying the lower bunk or sitting at the desk must do all of his reading during the daylight hours. Dr. Powitz commented, "[w]hile the upper bunk lighting level conforms to acceptable standards, the lower bunk and desk area are far below a comfortable level which is conducive to reading, writing or hobbycraft." Plaintiffs' Exhibit 673 at 10. In addition to causing eye strain, the inadequate lighting impedes the inmates' ability to clean thoroughly and move around safely.

### f. *Plumbing*

The plumbing at the institution is in serious disrepair. Commenting on the plumbing facilities at SCIP, Mr. Steigman stated that the institution is full of leaks and puddles. The drain lines under the South Block showers are dilapidated, resulting in septic water standing in the basement. Moreover, the leaks in the basement have corroded the electrical system and promoted the growth of fungus and vermin.

Nearly all of the commodes in the cells are constructed of old, cracked and porous vitreous china. These cracks harbor a buildup of urine sediment, resulting in noxious odors. Moreover, the paraffin filler at the bottom of the commodes often has dried out, causing occasional waste-water flooding on the cell floors. Rough concrete walls prevent adequate clean-up of urine splashed on the back and side walls. Water puddles on the cell floors, coupled with the poor level of sanitation, provide a living environment conducive to roach and rodent infestations.

SCIP officials take no measures to prevent plumbing problems in the cell block pipe chase. Although stop-gap repairs have been undertaken, no attempt has been made to remedy the problems permanently by building new risers or runs. Apparent-

ly, the SCIP maintenance policy regarding plumbing has been to patch, rather than to replace the pipes. During even these temporary plumbing repairs, the toilets in the affected cells are unusable, resulting in the accumulation of human waste for as long as 2 days.

### g. *Shower Facilities*

The shower facilities (or lack thereof) are one of the most serious problems in the institution. In the North and South Blocks, they are completely inadequate for the number of inmates who use them. Twelve showers serve 273 inmates in the North Block, or one shower for every 33 inmates. Similarly, in the South Block, 12 showers, or one shower per 62 inmates, are available for 741 inmates. Consequently, at most, inmates can shower 3 times each week.

But a more serious problem is the lack of security. The showers, located at the end of the cell block, are far out of view of the corrections officer stationed at the door at the opposite end of the block. As a result, the perilously unsupervised shower area causes the weaker inmates who fear attacks in the shower to take "bird baths" from the sinks in their cells. Corrections officers, inmates and experts alike agreed that real dangers exist in these showers, where predators await weaker prisoners.

The showers are poorly maintained, as evidenced by broken and plugged shower heads and faucets. Although many are inoperable, others run continuously. When we toured the institution, several showers, not currently in use, were running at full blast. Like the cells, lighting is also insufficient in the showers because the electrical system has degenerated and become nonfunctional.

Body greases, bacterial slime and fungus stain the shower tiles, thus facilitating health and sanitation problems. The showers are encrusted with dirt, and slime has accumulated in the chronically wet areas. Passing the showers on our tour, we noticed a heavy septic smell emanating from the area and wondered how any inmate

could tolerate the physical conditions of the shower long enough to wash himself.

### 4. Effects of Overcrowding

The physical plant and infrastructure of the prison have undoubtedly been strained by overcrowding. By defendants' own admission, SCIP has been and continues to be seriously overcrowded. James A. Wigton, Deputy Superintendent for Treatment at SCIP, noting a 10% annual increase in the inmate population, testified that SCIP has been overcrowded for the past five years.

In a 1983 memorandum to former Pennsylvania Department of Corrections Commissioner, Ronald J. Marks, Superintendent Petsock, commenting on the overcrowded conditions at SCIP, wrote:

> ... staff are tremendously overtaxed with short fuses. Inmates are on edge because they are elbow to elbow. An increase of any type beyond what we are holding now could be a very dangerous situation. In view of all of my remarks, I feel we are doing a good job with good control with what we have. I did not want to leave you with the impression we were running out of control, but anymore increase in population could and probably will cause problems.

Plaintiffs' Exhibit 469 at 2.

*In 1983, when that memorandum was written, the SCIP population was 1325 inmates. Today, the institution houses over 1800 inmates.*

#### a. *Double-celling*

Every witness who testified at the trial condemned double-celling in the North and South Blocks. For years, SCIP had a policy against double-celling inmates because of the small size of the cells and the concomitant consequences of double-celling. However, overcrowding and chronic staff shortages necessitated a change in this policy.

E. Eugene Miller, plaintiffs' expert penologist, noted that double-celling in the North and South Blocks has served to increase the opportunity for predatory activities and facilitated the spread of disease, already extant due to the unsanitary conditions and the close physical proximity of inmates in the cells.

Several qualified experts testified concerning the negative physical and psychological effects resulting from close confinement with a complete dearth of privacy in the small cells at SCIP. Most notably, stress, anxiety and depression are all enhanced. These problems, associated with double-celling in general, are more acute when, as here, inmates are double-celled in 39 or 56 square feet cells.

Moreover, the evidence reveals that the inefficient inmate classification system for pairing cellmates has exacerbated the negative effects of double-celling. The record is replete with instances where an inmate has been double-celled, even though his propensity for violence, emotional instability, primitive personal hygiene habits or past encounters with a designated cell partner clearly dictated that he should be single-celled. Although no system works perfectly, the seriously flawed classification system at SCIP is likely to continue to jeopardize the inmates' physical and mental well-being.

Clinic psychologists make classification decisions when the inmate first enters SCIP; an orientation committee initially screens the inmate to determine his eligibility for double-celling in the general population. However, because in the Clinic, as elsewhere, overcrowding is at an all time high, many new inmate arrivals are double-celled there before a counselor has evaluated them.

According to the written guidelines and procedures for double-celling, an inmate is ineligible for double-celling if he exhibits assaultive, aggressive or sexual behavior problems, or if he has serious psychiatric or medical problems. Plaintiffs' Exhibit 508. Initially, the inmate provides the only source of this information, which is not independently verified, and no outside resources exist for confirming information that would preclude double-celling. Since inmates rarely admit deviate sexuality, Clinic inmates harboring these traits are often cleared for double-celling before the

housing officer knows that a problem exists.

In theory, a caseworker supervisor should record the inmates's classification status on a form for the housing officer. Plaintiffs' Exhibit 508. However, Lt. McFetridge testified that officials at SCIP have not kept such a list since October 1987. Accordingly, although procedure calls for a formal screening process, its effectiveness is questionable.

Inmates approved for double-celling are given one or two hours to arrange for a cellmate before the housing officer assigns them one. Lt. McFetridge testified that, once an inmate has been cleared for double-celling, his only criterion is racial compatibility; he will not pair racially diverse individuals.

Inmates can remove themselves from a double-celling arrangement only by mutual consent; each must locate a new cellmate before the housing officer will reassign either of them. Accordingly, dominant inmates can control the fate of their vulnerable cellmates simply by refusing to locate another cellmate. However, Lt. McFetridge stated that under these circumstances, he would reassign the weaker inmate and would give the uncooperative inmate a "misconduct," placing him in the restrictive housing unit in disciplinary custody.

In addition, the overcrowding has created counterproductive practices in which inmates in self-lockup or protective custody have been paired with inmates assigned to administrative segregation, a status reserved for those who pose a threat to themselves or others. Placing the weaker inmates, who either have requested protective custody or have been assigned to it for their safety, with inmates in administrative segregation is akin to "putting the chickens in the fox's lair." Testimony of E. Eugene Miller.

In short, the decision to double-cell is motivated more by the unavailability of single-cells due to overcrowding and lack of staff than by the inmate's suitability for double-celling. Indeed, Superintendent Petsock testified that between 40 and 60 double-cell assignments are made each day at SCIP. This Court was presented with plenty of evidence regarding the physical and psychological pain that the inmates have suffered as a result of double-celling. Plaintiffs' Exhibits 540–574.

For example, the testimony of one inmate, whom we shall identify as AB, revealed that he had been double-celled in both the small and large cells with inmates who did not meet the institution's standards for double-celling. AB's first cellmate was a "jailhouse lawyer" who stored 17 boxes of legal material in his cell. His second cellmate, characterized as assaultive and a homosexual rapist, had been diagnosed as having a schizoid personality with paranoid tendencies.

AB's third cellmate was a "psychiatrically disturbed, filthy and mumbling inmate;" and his fourth cellmate, a severely paranoid psychotic, soaked his sheets with water and stood on the toilet for 6 hours one night. Chief Psychiatrist Herbert Thomas, M.D. had ordered that AB, by now exhausted, remain single-celled for a minimum of 4 weeks. However, he was double-celled 5 days later with an inmate who eventually stabbed him. Currently, AB is double-celled, against the advice of three psychiatrists, with a severely mentally ill inmate.

Although inmates testified regarding cellmate incompatibility, apparently the housing assignment officials are not responsive, primarily because they cannot find enough space to permit cell reassignments. But the space exists and is unavailable only due to a shortage of staff. Sadly, mounting overcrowding will force continued double-celling, promoting the concomitant likelihood of a fatal pairing.

### b. *Recreational Facilities*

SCIP has a serious shortage of recreational space. In recent years, the construction of new buildings has reduced the area for outdoor exercise to approximately one-half the size of a standard football field, obviously a small yard for over 1800 inmates. The paucity of space coupled with the severe overcrowding has shortened the amount of time inmates can spend outdoors. Consequently, inmates spend more

time in their cells, unable to vent tensions and frustrations through exercise.

Moreover, the gymnasium and auditorium are poorly guarded due to inadequate staffing. Ideally, use of these areas should aid in release of tensions. Instead, inmates encounter hostility and conflict, as stronger and more organized inmates openly prey on the weaker and less organized inmates. Several inmates testified that they were afraid to use the gym and auditorium, fearing they would be caught up in a violent altercation.

When we visited the auditorium, a lone corrections officer was stationed at the entrance. Testimony confirmed that normally he is the only officer in the auditorium.

### c. *Dining, Laundry Service and Clothing Supplies*

Overcrowding has also hindered the institution's ability to provide dining and laundry service to the inmates. A constant stream of inmates flows through the dining area, preventing employees from cleaning the tables between sittings and the dining hall between shifts. In 1983, Superintendent Petsock wrote, "we are so overtaxed with the increased population (holding 400 inmates more than we were designed for) by the time we finish feeding one meal, we start on the next one." Plaintiffs' Exhibit 469 at 1. Today SCIP has 500 more inmates than when Superintendent Petsock penned that memo.

The ovens and ranges in food service operate at least 12 hours per day. Food service, originally designed to feed between 500 and 600 inmates per shift, now must accommodate over 1800 inmates. To meet demand, food is perpetually prepared and served from 5:00 A.M. until 11:00 P.M. Approximately two million meals a year are provided at the prison.

In addition, this Court was presented with numerous inmate grievances in which the inmates complained that they did not receive underwear, towels, bedding and jackets. Inmates must often "borrow" these items from other prisoners, and must pay for them with either usurious interest rates or sexual favors. E. Eugene Miller stated that SCIP officials do not willfully deprive inmates of supplies; rather, because of overcrowding, the demand has simply overwhelmed the supply.

### B. *Legal Analysis*

In *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the United States Supreme Court established a threshold standard for eighth amendment violations which requires that conditions of confinement amount to "an unnecessary and wanton infliction of pain." *Id.* at 347, 101 S.Ct. at 2399. Such a standard can be met by demonstrating living conditions which seriously deprive the inmates of "basic human needs" or which deprive the inmates of the "minimal civilized measure of life's necessities." *Id.* Constitutional analysis of prison conditions constantly changes; criteria are derived from the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion).

When a court is faced with a comprehensive challenge to prison conditions, it must examine each specific condition to determine whether the particular condition violates the eighth amendment. *Capps v. Atiyeh*, 559 F.Supp. 894, 900 (D.Or.1983). However, individual unconstitutional conditions are often the result of several contributing factors; they do not exist in a vacuum. Thus, although overcrowding itself is not necessarily a constitutional violation, it can contribute to the effect of every deficiency in the prison's operations. *Hoptowit v. Ray*, 682 F.2d 1237, 1249 (9th Cir.1982). Accordingly, it is the effects which flow from the overcrowding that form the basis for the constitutional violation, not necessarily the overcrowding itself.

Under the eighth amendment, the state is obligated only to provide sentenced prisoners with adequate shelter, food, sanitation, medical care and personal safety. *Rhodes*, 452 U.S. at 348–49, 101 S.Ct. at 2400–01. The inmates at SCIP have alleged that overcrowding has led to the deprivation of all of these necessities of life, reducing them to the point where they have

fallen below the minimum eighth amendment standards. Elsewhere in this Opinion, we analyze the constitutionality of the medical care and personal safety of the inmates.

Now, we address the inmates' claims that the overcrowding at SCIP has reached a level at which the institution is unfit for human habitation, and that the inadequate food service and sanitation amount to cruel and unusual punishment.

### 1. Cell Size

We begin our analysis by examining the dimensions of the cells. Various professional corrections organizations have attempted to establish the minimum number of square feet that should be provided to an inmate. However, according to the United States Supreme Court, the recommendations of these groups "do not establish the constitutional minima," but "may be instructive in certain cases." *Wolfish*, 441 U.S. at 543 n. 27, 99 S.Ct. at 1876 n. 27; *Rhodes*, 452 U.S. at 348 n. 13, 101 S.Ct. at 2400 n. 13. Interpreting this directive from the Supreme Court, many courts have used these professional recommendations as some indication of what constitutes the "evolving standard of decency," and thus have relied on such standards as one factor in their analysis of the adequacy of an institution's housing facilities. *Ruiz v. Estelle*, 503 F.Supp. 1265, 1285 (S.D.Tex. 1980).

The American Correctional Association ("ACA") has promulgated standards for adult correctional institutions, many of which are labeled mandatory by the ACA and must be complied with to achieve accreditation by the Commission on Accreditation for Corrections. ACA, *Standards for Adult Correctional Institutions*, vii (2d ed. 1981). The standards of the ACA require that in general population housing, 60 square feet of cell space be provided prisoners who spend no more than 10 hours per day in their cells, and that 80 square feet be provided to prisoners whose confinement exceeds 10 hours per day. *Id.*, at standard 2–4129 (Supp.1988).

The American Public Health Association ("APHA") requires a minimum of 60 square feet per person in single cells. APHA, *Standards for Health Services in Correctional Institutions* (1976).

Many courts have attempted to establish standards for acceptable minimum living space. For example, in *Battle v. Anderson*, 564 F.2d 388, 395 (10th Cir. 1977), the United States Court of Appeals for the Tenth Circuit held that 60 square feet of living space in a cell was constitutionally adequate. However, the United States District Court for the Western District of Missouri in *Ahrens v. Thomas*, 434 F.Supp. 873, 901 (W.D.Mo.1977), held that 70 square feet was the minimum. A survey of the caselaw on this issue reveals that 60 to 70 square feet per cell constitutes the present "evolving standard of decency" regarding cell space per inmate. *See Inmates of the Allegheny County Jail v. Wecht*, 699 F.Supp. 1137, 1144 (W.D.Pa. 1988).

Measured against the 60 to 70 square feet criterion, the cell space in the North and South Blocks is completely deficient. The "large cells" in these cell blocks are 56 square feet, 23 of which represents uninterrupted space. The small cells, all of which are located in the North Block, are only 39 square feet with 15 square feet of uninterrupted space. Nevertheless, double-celling occurs in both cell configurations. Even if space were the only consideration in evaluating the constitutionality of the shelter provided to inmates at SCIP, the paucity of space in each cell would offend the Constitution's ban on cruel and unusual punishment.

However, in *Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 999 (3d Cir.1983), the United States Court of Appeals for the Third Circuit held that it is improper for a court to rely exclusively on per capita square footage recommendations or the number of inmates occupying one cell when analyzing the constitutional adequacy of shelter. *Id.* We must do more. The court must consider the "totality of circumstances" which bears on the nature of the shelter afforded to sentenced in-

mates, such as the general state of repair of the facilities, the amount of time prisoners must spend in their cells each day, and the "opportunities for inmate activities outside of the cells." *Id.* at 999, 1000. *See Dohner v. McCarthy*, 635 F.Supp. 408, 425 (C.D.Cal.1985) (Although single-celling in a cell measuring 56 square feet is undesirable, it is not unconstitutional when adequate cleanliness, ventilation and sanitation exist). We found no caselaw in which prisoners were double-celled in 56 square foot cells, let alone 39 square foot cells.

We will now consider those other factors.

### 2. Cell Conditions

In addition to the deficiency in cell size, the North and South Blocks are in a serious state of disrepair and fail to meet the health and safety needs of the prisoners in many respects.

#### a. *Ventilation*

The ventilation in all of the cells is wholly inadequate and far below ACA standards. Proper ventilation prevents the accumulation of odors, smoke, dust and other contaminants, and thus hinders the spread of disease. ACA standards call for circulation of at least 10 cubic feet of outside or recirculated filtered air per minute per human occupant. ACA, standard 2–4130 (Supp.1988). However, Dr. Powitz reported that there was *no* detectable air flow in the 6 cells that he tested.

Insufficient ventilation, which undermines the health of the inmates and the sanitation of the institution, itself violates the eighth amendment. Moreover, a lack of ventilation coupled with double-celling increases the likelihood of disease, as well as frustration brought on by uncomfortable temperatures and odors.

#### b. *Lighting*

Like ventilation, adequate lighting is one of the fundamental attributes of "adequate shelter" required by the eighth amendment. *Hoptowit v. Spellman*, 753 F.2d 779, 783 (10th Cir.1985). Lighting in the double cells is completely insufficient. Since the cells were not designed to house two inmates, the virtually nonexistent lighting for inmates on the lower bunks fails to meet the minimum requirement of 20 footcandles of illumination prescribed by the ACA. ACA, standard 2–4130 (Supp. 1988). As a result, at least one inmate in a cramped double cell cannot divert himself by reading or engaging in hobbycraft and, in addition, may suffer eyestrain. Certainly, inadequate lighting impedes attempts at basic sanitation. Insofar as double-celling is concerned, the lighting deficit amounts to a violation of the eighth amendment.

#### c. *Sanitation*

Similarly, the status of sanitation in the blocks is unconstitutional. The cells are dirty, ill-maintained and unsanitary. The institution lacks adequate cleaning supplies, making cleaning virtually impossible. No formal housekeeping plan exists, and when a cell is vacated, no terminal cleaning is done prior to reassignment.

Other circumstances contribute to the filth. The cracked and uncleanable commodes result in an odiferous and unsightly white-scale urine buildup. Bed bugs, their number directly related to the close proximity of the cells and double-celling, are rampant throughout the North and South Blocks. Finally, the birds living in the blocks defecate on the tiers outside the cells, contributing to the potential spread of disease.

Sanitation is one of the basic human needs guaranteed by the eighth amendment. *Union County Jail*, 713 F.2d at 984 n. 19 (citing *Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400). We hold that conditions at SCIP are inconsistent with the eighth amendment entitlement to sufficient sanitation and that the health hazards associated with these deficiencies amount to an unnecessary and wanton infliction of pain. *Hoptowit*, 753 F.2d at 783. The discomfort associated with the minimum cell space is thus magnified by the intolerable and unconstitutional physical conditions of the cells.

### 3. Showers

Overcrowding has also strained the other physical facilities beyond their capacities. When assessing the constitutionality of

prison conditions, "a decaying physical plant allowed by disrepair to become virtually inoperable has almost always provided an important background element." *Union County Jail*, 713 F.2d at 1001 n. 30 (citing *Ramos v. Lamm*, 639 F.2d 559 (10th Cir.1980)).

The number of showers in the North and South Blocks, even assuming each is operable, is insufficient to meet the basic physical needs of the inmates. There is only one shower for each 33 inmates in the North Block and one shower for 62 inmates in the South Block—and these often are out of order. Consequently, inmates are fortunate if they can shower three times a week. ACA standards recommend that each inmate shower daily, and that no inmate bathe less than three times each week. *ACA*, standard 2–4268 (2d ed. 1981). In addition, the ACA recommends a ratio of one shower to 15 inmates. *Id.* The paucity of showers at SCIP deprives the inmates of basic hygiene and threatens their physical and mental well-being.

### 4. Food Service

Food service and facilities are incredibly strained by the overcrowding. The number of inmates that must be fed makes it impossible to clean the dining room adequately between meal times, creating unsanitary conditions. However, although plaintiffs' expert was critical of several aspects of food service, our unannounced inspection revealed a clean and well-maintained kitchen and dining area. Indeed, Mr. Steigman testified that the institution has eliminated recently most of the past health infractions such as improper dishwasher settings, incomplete cleaning, observable insect and rodent infestation, and improper food temperatures.

We hold that although room for improvement exists, the food service conditions do not amount to a constitutional violation. Furthermore, we commend the institution staff for attempting to remedy the past infirmities and encourage it to maintain compliance with public health standards, recognizing that it is in the best interest of both the staff and inmates to do so.

### 5. Time in Cell

The amount of time inmates spend in their cells is pivotal in determining whether the conditions of their confinement are unconstitutional. *Bell v. Wolfish*, 441 U.S. 520, 543, 99 S.Ct. 1861, 1876, 60 L.Ed.2d 447 (1976). Inmates at SCIP have been locked in their cells for increasingly long periods each day. The South Block and much of the North Block house general population inmates who spend roughly 13 to 15 hours per day in their cells. However, the North Block also houses the overflow of Clinic inmates, who spend 16 hours a day in their cells, and administrative segregation inmates, who are locked in for 22 hours a day. Clearly, the long periods of time that SCIP prisoners spend in their filthy, unsanitary quarters seriously aggravate the discomfort created by the size of the cells themselves.

Unfortunately, SCIP recreational areas cannot alleviate the discomfort caused by the deplorable cell conditions. SCIP does not have ample facilities to satisfy most inmates' basic need for physical exercise. The shortage of recreational space, coupled with severe overcrowding, reduces the amount of time inmates can spend outdoors and increases the time they must spend in their cells. Moreover, because security is completely inadequate in the gymnasium and the auditorium, corrections officers cannot properly supervise inmates or prevent them from preying upon, or corrupting, each other. As a result, many inmates, fearing danger, opt to remain in their cells rather than utilize the recreational areas.

### 6. Double–Celling

The intolerable living conditions are exacerbated by the double-celling. In some instances, double-celling itself may amount to an eighth amendment violation. *Dohner v. McCarthy*, 635 F.Supp. 408, 425 (C.D. Cal.1985). In *Bell v. Wolfish*, the United States Supreme Court held that courts must consider the size of the cells, the opportunities for inmates to leave their cells during the normal routine of prison

life, and the permanence of double-celling when analyzing its constitutionality at an institution. *Wolfish*, 441 U.S. at 541–43, 99 S.Ct. at 1875–76. As stated above, the SCIP cells fall below the minimum size prescribed by both courts and corrections experts for even one inmate. In addition, the lack of opportunity for time outside the cell magnifies the ill-effects of the cell size itself.

Apparently, without court intervention, double-celling at SCIP will exist into the infinite future. Approximately 70% of the inmates at SCIP are double-celled, and according to Superintendent Petsock, the constant overcrowding at SCIP renders double-celling inevitable and indefinite. Inmates have little chance of being transferred to single-cells at any time during their incarceration.

Furthermore, SCIP is a long-term confinement institution; although the average time served is two years, many inmates serve longer sentences, life sentences and death sentences. Apropos here is Justice Stevens' pithy comment in *Hutto v. Finney:* "[a] filthy overcrowded cell and a diet of 'gruel' may be tolerable for a few days and intolerably cruel for weeks or months." *Hutto*, 437 U.S. at 686–87, 98 S.Ct. at 2571–72.

Similarly, in *Bell v. Wolfish*, the Supreme Court recognized that the length of confinement is a factor in analyzing the constitutionality of the conditions of confinement. In *Bell v. Wolfish*, however, the Court was analyzing an average term of 60 days confinement when it stated, "[w]e simply do not believe that requiring a detainee to share toilet facilities and this admittedly rather small sleeping place with another person for generally a maximum period of 60 days violates the Constitution." *Wolfish*, 441 U.S. at 543, 99 S.Ct. at 1876.

Unlike the 60 days at issue in *Bell v. Wolfish*, the conditions of confinement at SCIP have no foreseeable end. Here, we believe the longer confinement periods make double-celling all the more intolerable.

The overcrowding at SCIP has also impeded the prison staff's ability to be flexible and responsive to individual needs and problems. There simply are not enough single cells utilized to accommodate inmates who have medical, psychological or emotional problems. As such, the staff has been virtually forced to abandon the institution's procedures and policies for double-celling, with the result that violent, delusional and predatory inmates are often paired with other inmates. Double-celling under these circumstances amounts to a cruel and unwarranted infliction of pain.

■ Accordingly, we hold that the combination of inadequate cell size, unsanitary conditions, lack of ventilation, poor lighting, and inadequate and filthy shower facilities at SCIP creates an unconstitutional situation. Overcrowding has led to the deterioration of critical living requirements, and has magnified the stress of simple survival in the North and South Blocks. This aggregation of conditions makes the cells constitutionally unfit for one inmate, let alone two, thus depriving SCIP inmates of the adequate shelter to which the eighth amendment of the United States Constitution entitles them.

## C. *Remedy*

Having identified the specific conditions which violate the Constitution, our remedial task is to cause those conditions to be corrected and to bring the prison into constitutional compliance. We are mindful that we must devise the least intrusive remedy possible so as not to substitute court initiatives for prison administration.

Although we have held that even single-celling inmates in the small or large cells in the North and South Blocks is unconstitutional, we realize that population and space dilemmas plague SCIP officials. We also recognize that the Commonwealth has allocated monies for the construction of new housing at SCIP and that the institution has developed a plan for that construction. The hurdle has been the glut of inmates which makes implementation impossible. We emphasize that new housing at SCIP is

urgently needed and essential to alleviate the unconstitutional living conditions.

Accordingly, defendants (hopefully in cooperation with the Pennsylvania legislature and the Pennsylvania Department of Corrections) will have to devise a plan whereby the North and South Blocks will be replaced within a reasonable time so as to eliminate the constitutionally inadequate cells in this area. This will undoubtedly mean a reduction in SCIP inmates at least during the renovation. The Commonwealth will have to cooperate in these arrangements.

Prompt action is necessary to relieve the egregious conditions imposed on inmates by double-celling. With sufficient staff, more cells can be utilized. Defendants will have to take immediate steps to eliminate double-celling in the North and South Blocks by hiring sufficient additional corrections officers to staff the now vacant tiers. However, we will permit an exception to single-celling. If two inmates request to live together, and prison authorities do not object to the inmates sharing a cell, then those inmates may double-cell.

## V.

## INMATE SECURITY

A. *Findings of Fact*

The lack of adequate corrections staffing at SCIP not only has prevented the use of otherwise available cells, but has also created a dangerous living environment for SCIP inmates.

Reported inmate assaults numbered 69 in 1988, 123 in 1987, 81 in 1986, 138 in 1985, and 76 in 1984. For inmate assaults, SCIP administrators issued 52 "misconducts" in 1988, 30 in 1987, 52 in 1986, 51 in 1985, and 65 in 1984. A misconduct in this context is issued only after the disciplinary board determines that a particular inmate is guilty of committing an assault on another inmate.

It is impossible to determine the actual number of inmate-on-inmate assaults that occur at SCIP. No doubt the number of actual assaults is significantly higher than those reported; inmates, finding themselves in a "Catch–22," are reluctant to report assaults due to the likelihood of retaliation through additional assaults. Records show that inmates sometimes seek medical attention after an incident; they frequently report that they accidentally hurt themselves, say that they do not know how they were injured or simply refuse to give any explanation.

The ease of access to weapons exacerbates inmate violence. Inmate-manufactured weapons found throughout SCIP include homemade guns, brass rods, knife blades, metal bars, chisels, wrenches, hammer picks, ice picks, double and single-bladed axes, spikes, razor blades, and spears. These and other similar types of weapons have been confiscated from cell blocks, the machine shops, storerooms, the gymnasium, electrical boxes, the laundry, the school, medical wards, showers, and even the prison chapel.

The vast majority of these weapons are manufactured in and smuggled out of the prison industry facilities. Xylene, a flammable industrial cleaning solvent used solely in the industries areas, has also been smuggled out of the metal shop and has been used to set cells on fire.

Although SCIP maintains a policy that all inmates leaving the industries areas must be searched for hidden weapons, searches are not conducted on a routine basis. Lt. Charles Walsh, a corrections officer, testified that it is physically impossible for the lone officer assigned to the industries building to search every inmate as he leaves the building.

Lt. Walsh stated that, at most, the inmates are patted down on a random basis. No metal detectors are in place for searching inmates as they leave the industries buildings. Lt. McFetridge, the housing officer, testified that a metal detector was tested once; however, he understood that metal supplies in the prison industries area prevented it from working properly. Since then, prison officials have never identified a good place for a metal detector. SCIP officials search inmate cells for weapons

only occasionally, rather than on a regular basis.

Violence is not only attributable to the availability of weapons, it also is facilitated by inadequate staffing.

The housing areas are severely understaffed. Approximately 741 inmates reside in the South Block with at most 7 corrections officers assigned to the block at any time. "Blind spots" abound throughout the block where incidents, including rape, assault, cell theft, cell arson and drug use may occur unknown to the corrections officers. The shower area is one of the most dangerous areas; no corrections officers control this area on a full-time basis.

Lt. Walsh testified that the North Block is similarly understaffed. SCIP Corrections Officer Rodney Bouvier testified that, at times, only 3 officers monitor the approximately 273 inmates in the North Block.

Another housing area that suffers from a lack of adequate staffing is the newer A Block. This area houses disciplinary custody, administrative segregation and self-lockup or protective custody inmates. Inmates in A Block are sent to the showers two at a time without supervision. No consideration is given to the inmates' classification; self-lockup inmates may be forced to shower with disciplinary custody inmates. Consequently, altercations frequently occur in the showers.

Due to the lack of staffing, the auditorium and gymnasium are virtual dens for violence. Assaults, stabbings, rapes, and gang fights occur in the auditorium. During peak times, several hundred inmates may be present in these facilities with only one corrections officer assigned to each facility at any time. The corrections officers do not make rounds; they wisely choose to stand at the door, next to the riot button. Corrections Officer Michael O'Toole testified that any inmate who visits the auditorium does so at his own risk. Penologist E. Eugene Miller estimated that 20% to 25% of SCIP inmates will not go to the gymnasium or auditorium because of the violence that occurs there.

If the self-lockup inmates choose to go to the exercise yards, they must share the yard with administrative segregation inmates. Both of these inmate classes are placed in a yard adjacent to the exercise yard used by disciplinary custody inmates. Only a 15 foot chain-link fence separates the two yards. This encourages aggressive inmates to intimidate self-lockups. Disciplinary custody inmates have been known to climb over the fence to fight with those in administrative segregation. No corrections officers are assigned the sole task of guarding these inmates. Although the corrections officer in Tower # 5, located about 80 feet away from the exercise area, is assigned to watch over the area, that officer must also control the SCIP truck entrance and observe the general population.

A self-lockup inmate at SCIP testified that he has not used the exercise yard in over a year because he would be exposed to administrative segregation inmates that he desires to avoid.

B. *Legal Analysis*

■ The eighth amendment protects all prisoners from cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 102–03, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). The amendment safeguards inmates from an environment where physical and psychological deterioration is probable and self-improvement unlikely because of conditions which inflict needless suffering, whether physical or mental. *Battle v. Anderson*, 564 F.2d 388, 393 (10th Cir. 1977). All prisoners have a right to be protected from constant threats of violence, terror, physical aggression, and sexual assaults from other inmates. *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Woodhous v. Commonwealth of Virginia*, 487 F.2d 889, 890 (4th Cir.1973).

■ The Constitution cannot and does not guarantee an assault-free prison environment but certainly it promises good faith protection. *McGriff v. Coughlin*, 640 F.Supp. 877, 880 (S.D.N.Y.1986). A state

**1276**

violates its duty to protect inmates if its officials are deliberately indifferent to the safety needs of the inmates. *Hoptowit v. Ray,* 682 F.2d 1237, 1250 (9th Cir.1982). A state's deliberate indifference to inmate attacks and sexual assaults constitutes the "unnecessary and wanton infliction of pain" proscribed by the eighth amendment. *Jones v. Diamond,* 594 F.2d 997, 1017 (5th Cir.1979).

Deliberate indifference encompasses either of two species of culpability: actual intent or recklessness. *Little v. Walker,* 552 F.2d 193, 197 n. 8 (7th Cir.1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978). It may be shown where, in the face of high levels of prison violence, officials fail to provide adequate guards or use physical facilities that do not enable authorities to detect or prevent violence. *Toussaint v. McCarthy,* 597 F.Supp. 1388, 1415 (N.D.Cal.1984). A pervasive risk of harm does not require proof of a reign of violence and terror; "[i]t is enough that violence and sexual assaults occur on [an] idle tier.... with sufficient frequency that the younger prisoners, particularly those slightly built, are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures." *Wither v. Levine,* 615 F.2d 158, 161 (4th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980).

▮ *The evidence before us establishes that the Commonwealth has engaged in a pattern and practice of deliberate indifference to the security and protection of SCIP inmates.*

The failure to insure that inmates leaving the prison industries building are thoroughly searched has resulted in a prison industries area that is a virtual clandestine weapons manufacturing plant. Weapons may be found throughout SCIP; inmates hide them in their cells without fear of detection because there are not enough corrections officers to search cells regularly. The available weapons are dangerous instruments—guns, axes, spikes, razor blades, spears and tools. Whether the ne-

glect over the flow of weapons at SCIP is due to a lack of staffing or proper equipment, that failure is evidence of the Commonwealth's indifference to insuring a safe living environment for all its inmates.

Further evidence of this indifference is apparent in the Commonwealth's failure to staff the prison adequately with corrections officers. The *most favorable* ratio of corrections officer to inmate in the South Block is 1 officer to 100 inmates. The inmate-to-corrections officer ratio is even worse in the auditorium and gymnasium.

We hasten to add that we do not question the integrity of the officials at SCIP. They are merely jerry-rigging with a severe staff and supply shortage owing to budget constraints.

Due to the physical structure of the blocks, many areas cannot be viewed from a distance and accordingly require constant on site monitoring. Since not enough corrections officers are available to provide close scrutiny, some inmates are free to harass and assault weaker inmates with impunity—and they are well aware of the opportunity.

Specific affirmative actions due to staff shortages further demonstrate indifference to inmate safety. Inmates housed in A Block are required to shower under extremely dangerous conditions. Not only are showers unmonitored, but inmates of different classifications shower together; self-lockup inmates are forced to shower with disciplinary custody inmates. Similarly, inmates of different classifications are combined in the unguarded exercise yard; self-lockup inmates are required to go to the exercise yards with administrative segregation inmates.

The effects of weapons availability combined with the lack of adequate staffing are apparent—assaults, rapes, and cell thefts are frequent. Even though the number of reported inmate assaults does not appear extraordinary given the number of inmates housed at SCIP, in light of the circumstances there, we believe that unreported occurrences far surpass those reported. We note that being branded a "snitch" may have serious consequences to

an inmate's health. Therefore, SCIP inmates that fear for their safety may forfeit their shower and exercise privileges to avoid confronting other inmates when no corrections officers are present.

The conditions at SCIP evidence the Commonwealth's blatant disregard for inmate safety. This deliberate indifference violates the inmates' constitutional right to be reasonably protected from constant threats of violence, terror, physical aggression, and sexual assaults from other inmates. SCIP inmates are not receiving such protection and are being deprived of what is literally a life necessity. *See Ramos,* 639 F.2d at 572 (holding that Colorado was deliberately indifferent to legitimate safety needs of inmates when the state provided inadequate levels of guard staffing and when the design of cellhouses provided numerous "blind areas" where illegal activities could occur without detection); *Ruiz v. Estelle,* 503 F.Supp. 1265, 1303 (S.D.Tex.1980) (holding that the situation "clearly transgressed the boundaries of the eighth amendment" when the state failed to employ sufficient numbers of security officers to provide any systematic supervision of inmate activities and when only inmate trustees enforced order).

### C. *Remedy*

To remedy this unconstitutional situation, defendants will have to devise an appropriate plan to assure that all prisoners exiting the prison industries facilities will pass through a manned metal detector and be physically searched individually before being permitted to reenter the general population.

SCIP officials should also conduct regular random unannounced searches of inmate cells. The American Correctional Association ("ACA") recommends that prison procedure provide for unannounced and irregularly timed searches of cells, inmates and inmate work areas to control contraband. ACA, *Standards for Adult Correctional Institutions,* standard 2-4192 (Supp.1988).

SCIP officials will have to prepare for submission to the Court a plan for ade-quate corrections officer staffing with particular attention being paid to:

1) the number of officers assigned to the North and South Block housing areas;
2) provision for constant monitoring of the shower areas in all housing units;
3) the assignment of additional officers to circulate throughout both the auditorium and gymnasium facilities;
4) additional officers to monitor the A Block recreation area;
5) As stated in Part IV, C of this Opinion, sufficient officers hired to enable the now-empty cells to be utilized safely if, indeed, defendants want to use them.

After approval of such a plan by the Court, defendants will be given a stated time in which to recruit and staff this facility.

Although a larger security staff will not eliminate inmate violence, we believe that it will significantly reduce it and decrease the pervasive fear of violence that permeates SCIP. *See Williams v. Edwards,* 547 F.2d 1206, 1213 (5th Cir.1977) (courts may order prison officials to hire a sufficient number of guards to meet safety needs, depending on the number of prisoners and the structure of the prison).

## VI.

## FIRE SAFETY

### A. *Findings of Fact*

The North and South Block housing units and the connecting Rotunda are in essence one large building. They are attached physically and have the same basement. Since the walls separating these three areas are constructed mostly of glass, no fire protection material separates them.

The level of fire protection within the North and South Blocks is identical—poor. The Commonwealth has failed to provide major fire protection devices, such as stand pipes, fire alarms, sprinkler systems, or automatic fire detection and notification systems, in these housing areas. The Blocks are not equipped to detect and extinguish any fire other than small cell fires.

There are 40 dry extinguishers in the North Block and 20 in the South Block.

Although four large smoke exhaust fans have recently been installed on the roof of the South Block, they do not effectively provide protection from smoke. Tests reveal that if these manually-activated fans were turned on when a fire started, the smoke level would remain above the top floor of the cells for only about 90 seconds. After 90 seconds, the fans could not extract all of the smoke, and consequently, the smoke would dissipate toward the floor. The North Block is not equipped with a smoke exhaust system.

The Rotunda area stores a high concentration of combustibles. A storage area, located at the top of the Rotunda, contains boxes filled with paper records equalling 10 to 12 pounds per square feet of combustible materials. The storage area holds wooden chairs, drums of emulsifiers, tables, and other equipment. The inmate property storage room in the Rotunda basement contains bags, boxes and clothes in high concentrations of combustibles equalling 10 to 14 pounds per square feet. The property storage room is unoccupied at night and on weekends.

Likewise, the housing units have dangerous concentrations of combustibles. The cells in the South Block have a high degree of combustibles measuring 5 to 6 pounds per square feet. Combustible items line the cell doors and hang from the ceilings, potentially allowing for the rapid spread of fire among the cells. The mattresses in both the North and South Blocks are fire hazards. Many are ripped and display exposed combustible materials.

Thomas Jaeger, a fire protection engineer specializing in prison environments, testified that the South Block has the highest degree of "combustible loading" that he has ever seen during his examination of over 80 penal institutions.

The physical design of the North and South Blocks prevents rapid and safe fire evacuation. To evacuate the South Block during a lock-down when all inmates are in their cells, 522 doors would have to be individually unlocked. The Commonwealth has not installed a master unlocking system. Even if brave corrections officers stayed on each floor of the cell ranges, they would have to unlock 104 doors during a fire. Mr. Jaeger estimated that under ideal conditions, it would take 12 to 15 minutes to complete unlocking. Additional minutes would have to be added for the inmates to exit out of one of the two doors in the block. Many inmates would have to travel substantial distances to reach fire exits. All of this assumes, however, that any officer assigned to this task would be courageous enough to undertake it in a conflagration.

Mr. Jaeger testified that a complete evacuation of the South Block would take 15 to 17 minutes. This is an extraordinarily long time for evacuation because the block could fill with smoke and heat in 2 to 3 minutes.

Ideal conditions will never be present at SCIP in the facilities' present state. Door and lock opening problems persist. Moreover, inmate confusion would likely occur— inmates are not provided fire evacuation plans. Practice fire drill evacuations are not undertaken when the South Block is in lock-down.

Two SCIP inmates provided the Court with accounts of the chaos that erupted during a fire which spread from a cell in the South Block in January 1987. As soon as cell doors were unlocked, the corrections officers exited the building, and the inmates were stranded at the mercy of the predatory inmates. Many inmates were assaulted and were forced to remain in the block because other inmates obstructed the exits.

Mr. Jaeger opined that the level of fire protection in the North Block, South Block and Rotunda is so poor that a substantial danger of a multiple death fire exists. His conclusion was based on 1) the lack of fire protection devices, 2) the high number of inmates living in these areas, and 3) the large amount of combustible materials located in the cells. He added that SCIP's sole reliance on human intervention to detect fire, to notify others, to evacuate the buildings, and to extinguish the fire increases the likelihood of injury or death.

SCIP does not meet the Life Safety Code standards. These standards are promulgated by the National Fire Protection Agency and provide the minimum fire safety standards for any building. Joe Gavala, Fire Safety Coordinator for the Department of Corrections, testified that plans to bring SCIP up to Code standards are nonexistent.

To correct the fire safety deficiencies at SCIP, Mr. Jaeger recommended: 1) an automatic smoke detector and exhaust system for both blocks; 2) either sprinkler systems in cells or a reduction in the amount of exposed combustibles in cells; 3) an increased number of exits from the blocks; 4) smoke detectors; 5) a floor slab between the second and third floors; 6) some fire separation materials between the Rotunda and cell blocks; 7) an automatic fire alarm system; and 8) an electronic cell locking system.

### B. *Legal Analysis*

The eighth amendment ensures that prisoners will be provided with adequate fire protection during confinement. *Hoptowit v. Ray,* 682 F.2d 1237, 1249 (9th Cir.1982). Accordingly, prisoners have a right to be free from an unreasonable risk of injury or death by fire. *Leeds v. Watson,* 630 F.2d 674, 675–76 (9th Cir.1980). The failure to provide adequate safety equipment places inmates in constant danger of losing their lives if a fire were to occur in the prison.

■ The Commonwealth has an affirmative duty to provide adequate fire safety for its inmates. *Toussaint v. McCarthy,* 597 F.Supp. 1388, 1410 (N.D.Cal.1984). The eighth amendment does not require that prisoners be housed in a risk-free environment; the state must provide only reasonable fire safety measures. "[N]ot every deviation from ideally safe conditions constitutes a violation of the Constitution." *Santana v. Collazo,* 714 F.2d 1172, 1183 (1st Cir.1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984).

■ At SCIP, essentially no fire safety measures protect inmates housed in the North and South Blocks. Furthermore, no fire protection materials separate the North Block, South Block and the Rotunda. A major fire in any section could quickly spread to the other sections. Within the housing area no fire detection, prevention or suppression devices other than dry extinguishers have been installed, that is, no stand pipes, no fire alarms, no sprinkler systems, no smoke alarms, and no effective smoke exhaust systems.

This situation is extremely dangerous, as evidenced by the accounts of inmate witnesses who were present during the January 1987 fire. Even today the prison administrators are unable to ensure a safe evacuation of the North and South Blocks. With the lack of effective smoke exhaust systems, even a small fire would realistically threaten death or injury—most fire deaths result from smoke inhalation rather than from actual burning. These conditions present an unnecessary risk of tragedy and shock the conscience of this Court.

Given the lack of fire safety devices, the high concentration of combustibles, the number of inmates in the housing units and the low number of corrections officers assigned to guard them, we agree with Mr. Jaeger that a substantial danger of a multiple death fire is constantly present in the North and South Blocks.

It is tragically ironic that the Commonwealth of Pennsylvania, charged with the protection of all citizens, permits over 1800 inmates assigned to its custody and a number of its employees to live and work in an environment that violates the rules that the Commonwealth applies to all other buildings and workplaces. *See* Pennsylvania Fire and Panic Act, 35 Pa.Stat.Ann. § 1221, et seq. *See also* ACA, standard 2–4162 (Supp.1988) ("Local or state fire codes must be strictly adhered to in order to ensure the safety and well-being of the inmates and staff.").

By pure luck, SCIP has not yet experienced a major tragedy caused by fire; we are not going to wait for one to occur before concluding that the personal safety of inmates is at risk to an unconstitutionally impermissible degree. We find that the Commonwealth has failed to provide a rea-

sonably safe place of confinement for SCIP inmates housed in the North and South Blocks, and consequently, is violating the eighth amendment rights of those prisoners. *See Toussaint*, 597 F.Supp. at 1410 (holding that the state's "blatantly inadequate" fire safety program violated the eighth amendment when state prison housing units lacked fire standpipes, a sprinkler system, and smoke detectors and when inmates were not provided with evacuation instructions); *Laaman v. Helgemoe*, 437 F.Supp. 269, 323 (D.N.H.1977) (holding that inmates were not provided with a reasonably safe place of confinement when there was danger of loss of life due to combined effects of inadequate fire protection, lack of emergency evacuation plan, lack of master locking system, partially combustible physical plant, and possession of lighter fluid by inmates).

### C. *Remedy*

Defendants will have to take immediate steps to remedy the unconstitutional environment. Although fire danger never can be eliminated, it can be reduced. Defendants will have to provide the Court with a plan to ensure that inmates housed in the North and South Blocks are reasonably safe from the dangers of fire, pending the replacement of those blocks.

We suggest that in devising its plan, the Commonwealth should consider installing or implementing the following: fire and smoke alarms, stand pipes, sprinkler systems, effective smoke exhaust systems, an electronic master cell locking system, additional exits from the blocks, fire separation materials between the Rotunda and the blocks and between floors within the blocks, an inmate evacuation plan, increased corrections coverage in areas with high degrees of combustibles, a reduction in exposed combustibles in cells, and mattress replacement. It is the Commonwealth's responsibility to provide a reasonably safe environment using all or a combination of these measures. This may be modified depending on the schedule for replacing the North and South Blocks.

The Commonwealth should take advantage of the numerous resources available to it in determining what protection measures are necessary—the Commonwealth's fire code, the Commonwealth's Fire Marshall, private consultants, City of Pittsburgh Fire Department assistance, the National Fire Protection Association's Life Safety Code, and the ACA's Standards for Adult Local Detention Facilities.

If the Commonwealth's plan does not provide SCIP inmates housed in the North and South Blocks with a reasonably safe living environment, the Court itself will specify which fire safety measures must be implemented to render the environment constitutional.

### VII.

### ACCESS TO THE COURTS

#### A. *Findings of Fact*

The Commonwealth has provided SCIP inmates with a law library located in a general collection library. Approximately 50 inmates may use the library at a time.

Katherine Manners, a trained librarian, supervises the library, assisted by one library assistant and twelve inmate clerks. Three of the inmate clerks are assigned to the law library; they have no legal education nor do they provide legal assistance to other inmates.

With a few exceptions, inmates may use the library Monday through Friday from 8:30 A.M. to 10:50 A.M., 1:30 P.M. to 3:15 P.M., and 5:15 P:M. to 7:50 P.M. The library is closed on weekends.

Clinic inmates may use the library only on Tuesday evenings when it is reserved solely for them. The inmates rotate by Clinic section; each inmate may go to the library once every other week. Only 30 Clinic inmates may use the library at a time, and they may not order law books for delivery to their cells.

Prison administrators do not permit inmates residing in the restrictive housing units (disciplinary custody, administrative segregation, and self-lockup inmates) to visit the library at any time. To obtain law

books, these inmates must request them for delivery to their cells. An inmate may order books twice a week and may receive up to 3 books for each request.

The law library has only one copy of each law book, and consequently, requested volumes frequently are unavailable due to the great demand and limited supply. The law library also maintains a file of photocopied cases but has only one copy of each case available. Inmates can request as many copied cases as they need and may keep the copies for 30 days.

The library staff also provides a case citation research and verification service (commonly known as "Shepardizing") for restricted housing inmates. In response to an inmate request, the staff will provide a handwritten list of cases that refer to the Shepardized case. In light of the number of requests and lack of computerized legal research, inmates may have to wait several weeks for a response. One inmate testified that he has waited for up to 8 weeks before receiving the results of a Shepardizing request.

Although the Commonwealth does provide indigent inmates with counsel in post-conviction hearings, *see* Pennsylvania Public Defender Act, 16 Pa.Stat.Ann. § 9960.6; Pennsylvania Post Conviction Relief Act, 42 Pa.Cons.Stat.Ann. § 9543, it does not provide restrictive housing inmates with legally trained persons to assist them in filing civil rights actions.

Prison administrators do not provide an opportunity for restrictive housing inmates to discuss their legal matters with other inmates. Moreover, opportunities for written communication are almost non-existent. Indeed one inmate testified that "jailhouse lawyers" (inmates self-taught in law) may speak with other restrictive housing inmates only in the exercise yards.

To obtain assistance from jailhouse lawyers, inmates must communicate by passing letters or legal documents to a corrections officer, who then conveys the materials to a lieutenant for review. If the lieutenant permits, the corrections officer may deliver the materials to the other inmate. The officers do not follow any apparent standards in deciding when to forward legal materials. According to one inmate, few corrections officers agree to transfer legal materials to other inmates.

An inmate jailhouse lawyer in self-lockup testified that corrections officers do not allow self-lockup inmates to talk to each other or to pass legal materials among themselves. He stated that, as a result, inmates smuggle their papers to jailhouse lawyers.

Another self-lockup inmate testified that although he receives requests from illiterate inmates for legal advice, he may not talk to them about their cases. He suggested that the tables located in the pods of the restrictive housing units be reserved for inmate conferences with jailhouse lawyers.

### B. *Legal Analysis*

Prisoners have a well-established constitutional due process right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). It is fundamental that access to the courts for the purpose of challenging confinement, conditions of confinement or violations of civil rights may not be denied or obstructed. *Id.* at 827, 97 S.Ct. at 1497; *Johnson v. Avery*, 393 U.S. 483, 485, 89 S.Ct. 747, 748, 21 L.Ed.2d 718 (1969).

This right of access places upon prison authorities an affirmative duty to assist inmates in preparing legal papers, either by 1) providing adequate access to law libraries, 2) providing assistance from legally trained persons, or 3) providing some combination of both. *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498. Moreover, states may not prohibit inmates from furnishing legal assistance to other inmates. *Johnson*, 393 U.S. at 490, 89 S.Ct. at 751; *Bryan v. Werner*, 516 F.2d 233, 236–37 (3d Cir.1975). *See* ACA, standard 2–4326 (Supp.1988) ("When an inmate is unable to make meaningful use of the law library alone, additional assistance necessary for effective access is provided.").

 Although the right of court access is not absolute and may be curtailed to

accommodate institutional security interests, *Bounds*, 430 U.S. at 830–31, 97 S.Ct. at 1499–500, the burden rests with the state to demonstrate the adequacy of the methods it chooses in extending this right. *Buise v. Hudkins*, 584 F.2d 223, 228 (7th Cir.1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979).

Plaintiffs contend that Clinic inmates and restrictive housing inmates are denied meaningful access to the courts. Under *Bounds*, the narrow issue that we must consider is whether the Commonwealth offers these inmates meaningful court access by either affording acceptable law library use or providing legally trained persons to assist the inmates. *See Peterkin v. Jeffes*, 855 F.2d 1021, 1041 (3d Cir.1988) (inmates alleging denial of access to courts do not have to demonstrate actual injury other than denial of access).

As previously noted, the Commonwealth does not enable these inmates to communicate with legally trained persons for assistance in filing civil rights actions. Under *Bounds*, we must thus decide whether Clinic and restrictive housing inmates are provided adequate access to the law library.

Although the Constitution does not guarantee a prisoner unlimited use of a law library, the Commonwealth must afford reasonable time in the library. *Lindquist v. Idaho State Board of Corrections*, 776 F.2d 851, 858 (9th Cir.1985). Prison officials may regulate the time, manner, and place in which law library facilities are used but in doing so may not deny meaningful access. *Twyman v. Crisp*, 584 F.2d 352, 358 (10th Cir.1978).

■ We find that Clinic inmates are not given adequate access to the law library. At any time, several hundred inmates reside in the Clinic. Due to the enormous population of Clinic inmates and the limited law library time allotted for them, a Clinic inmate may have, at most, 4 hours a month of law library time. Even experienced legal researchers would have difficulty conducting useful research with such limited availability.

SCIP therefore does not permit Clinic inmates meaningful access to the courts.

Restrictive housing inmates may not even visit the law library. They may obtain law books only by a book paging system, a substantial disadvantage. First, inmates must know initially which volumes they need. However, it may take several requests for case digests before they target relevant case citations.

Second, unavoidable and lengthy delays are inherent in such a system. The process of ordering and returning books, compounded by hindrances in obtaining Shepardizing results, drastically prolongs legal research. Inevitably, inmates may have to wait several weeks for a volume because 1) many inmates desire to procure law books, 2) the number of books are limited to one set of each reporter and one photocopy of each case, and 3) the seminal criminal law cases are constantly in demand. Thus, some inmates likely are prejudiced by a reduced opportunity to complete research before court filing deadlines.

We share the concerns of other courts that have examined a denial of access to trained legal assistance in conjunction with access to a law library offered solely through a book paging system.

In *Morrow v. Harwell*, 768 F.2d 619, 623 (5th Cir.1985), the United States Court of Appeals for the Fifth Circuit held that a bookmobile-style distribution system without an accompanying legal assistance program was inadequate under *Bounds*. The *Morrow* court stated:

> In the absence of some sort of direct legal assistance, which need not be by trained lawyers, the inmates must be given access to a library as required in *Bounds*. That access is not met by a system allowing a prisoner to check out books through a weekly bookmobile. The Federal Supplement, the Federal Reporter and the Supreme Court Reporter today consist of a total of approximately fifteen hundred volumes. Even a quick research project by a trained lawyer may require reference and cross reference to numerous volumes. Such a task would be impossible to complete with no legal

assistance and only the limited library program presently in place.

*Id.* *See also Para–Professional Law Clinic v. Kane,* 656 F.Supp. 1099, 1104 (E.D. Pa.) (Graterford prison's program of providing a small number of cases or books upon inmate request does not satisfy *Bounds* ), *aff'd,* 835 F.2d 285 (3d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988); *Williams v. Lane,* 646 F.Supp. 1379, 1407 (N.D.Ill.1986) (protective custody inmates were not given meaningful access when they were denied trained legal assistance and direct access to law books); *Martino v. Carey,* 563 F.Supp. 984, 1003 (D.Or.1983) (inmates were not given meaningful access to courts when they had to obtain law books through book paging system and County did not provide legal assistance).

In *Williams v. Leeke,* the United States Court of Appeals for the Fourth Circuit held that prisoners in maximum security cells who could obtain law books only through a book paging system were not denied meaningful access to the courts. *Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979). In that case, South Carolina operated state-funded programs which provided trained legal assistance to inmates contesting the conditions of their confinement. *Id.* However, in discussing the book paging system, the court commented:

> Ordinarily, a prisoner should have direct access to a law library if the state chooses to provide a prison law library as its way of satisfying the mandate of *Bounds.* Simply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful chance to explore the legal remedies that he might have. Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case. Certainly, a prisoner, unversed in the law and the methods of legal research, will

need more time or more assistance than the trained lawyer exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

*Id.*

We conclude that the denial of realistic access to the law library and denial of access to legally trained persons to restrictive housing inmates has resulted in a constitutionally inadequate system to ensure meaningful access to the courts.

As the *Bounds* court noted, acceptable legal assistance programs for prisoners may assume many forms, including inmates trained as paralegal assistants working under lawyers' supervision, volunteer attorneys, paraprofessionals or law students working through bar associations and law schools or lawyers hired on a full or part-time basis. *Bounds,* 430 U.S. at 830, 97 S.Ct. at 1499. We will permit the Commonwealth discretion to design its own constitutional plan. If the plan does not comport with *Bounds,* we will order specific modifications.

Another issue we must consider is access to so-called jailhouse lawyers. The evidence demonstrates that the Commonwealth is actively discouraging the jailhouse lawyer trade among restrictive housing inmates. We also appreciate the fears of prison authorities. Unsupervised and unlimited contacts could result in unlawful conspiracies. The jailhouse lawyers, after all, are also convicted felons.

Although the Court recognizes that inmates are held in solitary confinement for punitive reasons, such inmates do not leave their constitutional rights at the jailhouse door. At the same time we realize that segregated inmates usually have displayed a propensity towards violence, and their movements must be closely-monitored. We believe that available space in the restrictive housing unit enables defendants to provide these inmates with an adequate opportunity to confer with jailhouse lawyers. For example, the Commonwealth might allow only two inmates to leave their

cells at once and limit their discussion to a half-hour.

We also appreciate that a "jailhouse lawyer" enjoys no definition. Any inmate can claim to be one. SCIP authorities may define the term "jailhouse lawyer" and maintain an approved list of inmates with that designation.

### C. *Remedy*

Defendants will have to devise and implement a plan ensuring all Clinic inmates a minimum of 4 hours a week of law library time. *See Nadeau v. Helgemoe*, 561 F.2d 411, 418 (1st Cir.1977) (inmates were entitled to expanded library schedule when law library access was limited to 1 hour per week and when it could be increased at little or no cost).

The plan will also have to ensure that all restrictive housing inmates have meaningful access to the courts either through adequate access to the law library or through access to legally trained persons, or some combination of the two.

SCIP officials should seriously consider the role of jailhouse lawyers' assistance and devise a plan in which all restrictive housing inmates are afforded access to constitutionally adequate legal assistance. If jailhouse lawyers, in the eyes of Commonwealth officials, constitute a threat to the institution, the Commonwealth will be free to provide alternative means of legal assistance.

### VIII.

### HEALTH CARE

### A. *Findings of Fact*

#### 1. Mental Health

##### a. *Psychiatric Staff*

At trial the Court heard evidence about SCIP's psychiatric services from several witnesses. Plaintiffs offered testimony from Jeffrey L. Metzner, M.D., a forensic psychiatrist; E. Eugene Miller, a penologist; Frank Meacci, Jr., Ph.D., Chief Psychologist at SCIP; Allan Pass, Ph.D., psychologist, Director of the Clinic; Gloria Flateau, R.N. and Garnet Shoaf, R.N. Defendants presented the testimony of Herbert E. Thomas, M.D., Chief Psychiatrist at SCIP since 1962; and Katherine Boyle, R.N., Nursing Supervisor.

The SCIP psychiatric department is seriously understaffed. Three psychiatrists work on a contractual basis for an approximate total of 33 hours a week. Testimony of Dr. Metzner. Dr. Thomas, testifying about physician staffing, opined that psychiatric care at SCIP is adequate, although he recommended some changes to effect better care.

Each week Dr. Thomas spends as little as 10 or 12 hours or as many as 17 or 18 hours at the prison. He is on site for one-half day on both Thursday and Saturday and spends all day Friday either in the prison or in court on behalf of the prison. On Sundays he completes paperwork or sees patients as needed. The other psychiatrists understand that Dr. Thomas will telephone every evening at 10:30 P.M. to check with a nurse on the status of the psychiatric patients.

Dr. Thomas sees approximately 20 inmates each week. On Thursday from 9 A.M. to 12 P.M., he gives priority to infirmary patients. On Friday from 10:30–11:30 A.M., Dr. Thomas holds a conference with nursing, psychological and psychiatric staffs and the Director of Treatment to discuss those on the psychological monitoring list. This conference includes a 15 or 20 minute telephone call to Farview State Mental Hospital ("Farview") to discuss inmates who will be transferred into that hospital or back to SCIP. From noon to 3:15 P.M., Dr. Thomas processes commitments for, on average, 2 to 4 inmates.

Dr. Plesset spends 4 hours each on Tuesdays and Fridays, seeing approximately 25 men a week, primarily for medication monitoring. Dr. Lytton spends 10 hours on Mondays at SCIP, seeing approximately 35 to 40 men for classifications, parole and commutation evaluations, and medication monitoring. Drs. Plesset and Lytton make infirmary rounds on Mondays and Tuesdays.

No psychiatrist is present in the institution on Wednesdays. Dr. Thomas stated that an additional psychiatrist will soon be hired to work 8 hours on Wednesdays and to provide liaison with Western Psychiatric Hospital in Pittsburgh.

Dr. Metzner testified that significant delays occur between requests for a psychiatric consultation and the actual interview. Additional problems, attributable to staffing deficiencies, include the lack of follow-up and insufficient documentation, which restricts the ability of another psychiatrist to treat the patient.

### b. *Psychological Staff*

Dr. Meacci testified that, in addition to himself, the Psychology Department is staffed by Carl Theur, a Psychological Services Supervisor, and two Psychological Services Associates, Rebecca Kessler and Charles Mcavee. These individuals work from 8 A.M. to 4:30 P.M. Monday through Friday. No one is on duty or on call weekdays after 4:30 P.M. or on weekends. Because of a severe clerical staff shortage, the psychologists must complete their own paperwork, thereby depriving patients of treatment time.

The psychological staff performs the following functions for the percentages of time indicated: 1) monitoring, 25% to 30%; 2) evaluations for prerelease, parole, parole violations, commutations and lockup status, 25%; 3) commitments to mental hospitals, 5% to 10%; and 4) crisis intervention, 25%. In addition, the staff spends less than 20% of its time in individual and group therapy, with only 6% to 7% of that time spent in individual therapy. For an unspecified percentage of time, the psychologists classify incoming prisoners, spending 15 to 20 minutes with each inmate.

Dr. Pass testified that those who work in the Clinic classify each new inmate according to his psychological stability and needs before assigning him to an institution. If an inmate can function at a reasonable level, he may be assigned to another institution; if he cannot, he likely will be assigned to SCIP. The Clinic population has increased in the past few years from an average of 150 to 175 to more than 400 inmates.

Over the past 10 years the Clinic population has grown dramatically without a concomitant increase in staff. From May 1976 to May 1977, the Clinic processed 756 cases; from May 1986 to May 1987, the Clinic processed 1,566 cases. Plaintiffs' Exhibit 300. Dr. Pass estimated that the Clinic evaluated more than 1,566 cases from May 1987 to May 1988. Moreover, the length of a Clinic stay has expanded from 3 to 4 weeks a few years ago to approximately 9 weeks presently. Dr. Pass declared that the psychology staff is "sinking in professional quicksand" because of inadequate staffing. The increasing number of cases pressures the static staff to emphasize efficiency over quality during evaluations. As a result, psychologists may not uncover information regarding an inmate's violent propensities. Particularly disturbing is the imperative to reclassify Farview returnees who arrive at SCIP without records.

In an emergency, absent a psychiatrist on site, the psychologist telephones a psychiatrist for advice. The inmate and staff must then wait for a psychiatrist's evaluation of the inmate's condition. Although this system has not yet posed insurmountable problems, Dr. Pass opined that a psychiatrist should be on site for 24 hours a day.

### c. *Psychiatric Nurses*

Neither plaintiffs nor defendants offered testimony about psychiatric training for nurses. We assume, therefore, that SCIP does not hire nurses who previously have been trained in psychiatric nursing. In addition, SCIP does not provide inservice psychiatric training for the nurses. In short, apparently, SCIP does not currently have on its staff any nurse specifically qualified to care for psychiatric patients.

### d. *Psychiatric Social Workers*

Dr. Thomas stated that SCIP has not hired psychiatric social workers. Social workers are needed to fulfill the following functions: 1) form supportive relationships between the professional staff and the inmates; 2) work with the inmates and their

families before they are released from prison; and 3) give "talk therapy" to form a relationship with the inmate that reduces his need for medication.

### e. *Recommendations*

Dr. Metzner advised the following increases in the psychiatric staff: 2 additional full-time psychiatrists, 2 additional full-time psychologists, one of which should be assigned to the Clinic, and additional nurses to serve the infirmary.

Dr. Meacci opined that SCIP requires a total of 40 to 45 hours of psychological services, or 10 to 15 more hours than are presently provided. In particular, coverage is needed for mental health crises occurring after 4 P.M. To complement the psychological services, Dr. Meacci advised 4 to 5 hours of psychiatric coverage daily and 5 hours over weekends.

Dr. Pass recommended that the State additionally hire a psychologist, a counselor and clerical support for the Clinic. Dr. Thomas recommended that SCIP hire a chief social worker and 4 full-time social workers.

Even though Dr. Pass has discussed the staffing problem with the Commonwealth's Chief Psychologist in Harrisburg, he has been told that, because the State has not budgeted for new positions, he should "do the best [he] can." Plaintiffs' Exhibits 303, 304. Dr. Metzner also stated that, although Dr. Thomas serves as the Chief Psychiatrist, officials in Harrisburg make significant program decisions without consulting him.

### f. *General Conditions Affecting Psychiatric Care*

Plaintiffs' witness, Dr. Metzner, presented evidence based on 2 days of on-site evaluations at SCIP, during which he reviewed medical files, inmate grievances and extraordinary occurrence reports and talked to patients and prison personnel.

Dr. Metzner defined a severe mental illness as one that has caused significant disruption in an inmate's everyday life and which prevents his functioning in the general population without disturbing or endangering others or himself. Severely mentally ill inmates display symptoms of withdrawal, thought disorganization, bizarre behavior and difficulty with reality, often manifested by hallucinations. Some of these people are repulsive due to their total disregard for personal hygiene. Such inmates increase tension for staff and other inmates in an already strained prison environment by screaming all night, talking loudly to themselves, laughing hysterically for no apparent reason, and even setting fires. Testimony of Mr. Miller and Plaintiffs' Exhibits 164E, 165–179. Other inmates often lack patience and retaliate by assaulting these inmates, known as "bugs." Moreover, predatory inmates steal from the weaker ones or coerce their participation in sexual activities.

Prison psychiatrists see inmates with four different incurable but treatable mental illnesses: 1) schizophrenic disorder characterized by recurring psychotic episodes, personality disorganization, distorted thinking, hallucinations and paranoia; 2) affective or mood disorder manifested by either manic or depressive behavior; 3) paranoid disorder characterized by paranoid delusional beliefs; and 4) organic brain syndrome. In addition, inmates may manifest severe personality disorders with transient psychotic episodes.

Personality disorders, basically character defects, affect 80% of mentally disturbed inmates, but these are not amenable to treatment. Although these inmates appear to be mentally ill, they are in reality extremely immature. Dr. Thomas stated that the staff experiences difficulty in determining "who is bad and who is mad—who requires limiting and restricting and who requires nurturing and care." Psychiatrists see dual problems in inmates who are anti-social and also schizophrenic. Testimony of Dr. Thomas, Dr. Metzner and Dr. Meacci.

Dr. Metzner stated that between 120 and 180 inmates in the general population and approximately 60 to 80 inmates in the Clinic suffer from severe mental illness. Between 1984 and 1988, 60 to 80 SCIP inmates resided at Farview and 6 to 8 inmates resided at other state hospitals at

any given time. From May to July 1988, Farview admitted 100 inmates from SCIP.

Dr. Metzner calculated that between 15% to 20% of the general population and 15% to 20% of the Clinic population at SCIP have severe mental illnesses. Dr. Meacci set the percentage of severely mentally ill SCIP inmates at 10% to 15%. Dr. Metzner compared these rates to a 5% rate of severe mental illness in New York State prisons. Dr. Metzner attributed the higher rate of severe mental illness extant at SCIP to the following: 1) SCIP has an inordinate number of severely mentally ill inmates because SCIP is a regional center for receiving, identifying and housing these individuals; and 2) inadequate treatment for those housed at SCIP contributes to a further exacerbation of the inmate's condition. Dr. Metzner inferred that treatment is inadequate at SCIP from indications that the staff is not trained to recognize signs of an impending psychotic episode. As a result, for example, the corrections officers usually obtain psychiatric care for an inmate only after a dramatic event occurs.

Severely mentally ill inmates live in the general population in the North Block on J Range, in the South Block on P Range and in the new building in administrative segregation.

The staff accomplishes treatment for the mentally ill at SCIP by the following methods: 1) monitoring; 2) psychotropic medications; 3) infirmary care; and 4) admission to Farview.

Psychologists monitor approximately 130 to 180 patients, observing sleeping and eating habits, self-sufficiency and the degree to which the inmate could be a danger to himself or others. These mentally ill inmates, scattered throughout the prison, are monitored on weekly, biweekly or monthly schedules, as required. Many of these men do not respond to psychiatric "talk therapy;" many take psychotropic medication.

Two psychiatrists spend most of their time prescribing and monitoring medications. Supervision of psychotropic medication therapy is inadequate because at least 25% of inmates for whom drugs have been prescribed are noncompliant, and no dependable procedure exists to notify the psychiatrist of this problem. Procedure requires that each week the staff receive a list naming those inmates who have refused their medications. However, this list often either is incomplete or not compiled. The staff habitually becomes aware that a man is noncompliant only after the patient regresses and becomes acutely psychotic. Dr. Meacci stated, however, that the corrections officers effectively report bizarre behavior, once it occurs.

The current infirmary houses 10 to 15 psychiatrically ill inmates on 2 separate wards and in 2 observation cells. This unit, although it provides asylum from the general population, does not approach a treatment milieu because it is malodorous, filthy, dismal and inadequately staffed. The obsession or fascination of some mentally ill people with their own feces compounds the problems. Also, because the cold water in the shower malfunctions, several inmates have been scalded. Testimony of Dr. Metzner and Robert W. Powitz, Sanitarian.

In contrast, the new temporary infirmary, planned for use for the next 2 to 3 years, will provide adequate conditions conducive to mental health but only 4 to 5 psychiatric beds, a number Dr. Metzner concluded is inadequate. Currently, due to lack of bed space, delays occur in transferring to the infirmary an inmate who has been approved for admission. The staff fears that admissions to the smaller facility will be further curtailed. Testimony of Dr. Meacci.

Farview is Pennsylvania's only maximum security psychiatric hospital. Patients, most of whom are confined under criminal commitments, do not permanently reside there; however, some are committed for long terms. Dr. Thomas testified that most chronic, hallucinatory or regressed individuals at SCIP choose admission to Farview. For the profoundly psychotic who refuse to go to Farview voluntarily, Dr. Thomas pursues legal commitment procedures through the Court of Common Pleas. According to Dr. Thomas, the court denies only about one in 50 commitment

petitions. In the past, generally a week transpired between an SCIP inmate's approval for admission and his actual transfer. However, because of improved communication between SCIP and Farview, transfers have been occurring more expeditiously since May 1988.

Severely mentally ill inmates experience a phenomenon known as the "revolving door" between SCIP and Farview. As often as necessary, these inmates are transferred from the prison to the mental hospital for treatment periods of up to 90 days, after which they return to SCIP. Because SCIP personnel are unable to follow up the treatment prescribed at Farview, these inmates inevitably regress and return to the mental hospital. However, Dr. Thomas stated that the Farview revolving door is analogous to the situation in a normal community. For the severely mentally ill, the 60 to 90 day treatment period provides respite from the prison environment.

Dr. Metzner noted three elements of adequate psychiatric care, all of which are inadequately provided at SCIP: 1) environmental treatment; 2) psychotropic medication; and 3) individual or group psychotherapy.

In addition to his conclusions about the infirmary environment, Dr. Metzner opined that the physical environment of the prison in general, rather than promoting mental health, contributes to a deterioration of those suffering from severe mental illness. After visiting SCIP five times and spending 30% to 50% of his time in the North and South Blocks, Dr. Metzner stated that under the present conditions, it is impossible to create a therapeutic environment at SCIP. As examples of hostile, dirty and stressful conditions, he indicated that cells are virtually "garbage dumps" and that showering provokes anxiety because the showers are moldy, noisy, lack privacy and are dangerously unsupervised.

An inmate who refuses to take medications or who behaves dangerously in the general population is removed to administrative segregation where policy dictates that psychological counselling be discontinued. Thus, by regulation, prison officials deny appropriate care to the man most in need of it.

Dr. Thomas conducts a support group once a week for 8 inmates and a religious support group once a month for 9 inmates. At one time, under a previous prison administration, he supervised 15 groups. Dr. Thomas reported that Dr. Bernstein, whom he did not otherwise identify, conducts a Post Traumatic Stress Disorder group but does not serve SCIP in any other capacity.

Outlining some of the psychiatric problems he encounters at SCIP, Dr. Thomas reported that many inmates, particularly those in double cells, suffer from sleep disturbances. He provides medication to these inmates for periods of 30 to 60 days to prevent regression to significant mental disability or psychotic reactions.

Psychiatrists take drug addicts at their word for the extent of their addiction. They admit these inmates to the infirmary or put them on an outpatient withdrawal program, including medications and vitamins as necessary. Defendants' Exhibit 7 at 10aa.

According to Dr. Metzner, Dr. Thomas is the only psychiatrist who regularly visits the housing units. Dr. Thomas cares for death row inmates in the restrictive housing unit rather than have them brought to him in shackles.

### g. Specific Conditions Affecting Psychiatric Care

Acutely ill and violent psychiatric patients are confined in observation cells, under what a nurse described as "medieval conditions." Testimony of Ms. Flateau. A registered nurse can recommend that an inmate be placed in an observation cell. These cells contain mattresses on concrete slabs and a commode. They do not have sinks, chairs or tables. The cells are infested with roaches. Because the inmates are acutely psychotic, they smear themselves and the cells with human excrement. Personnel cannot clean the cells while the inmate is present and cells do not have drains to make washing easier. Nurses must get a lieutenant, or "white hat," to remove the inmate from the cell for showering; since a

psychotic patient often eschews hygienic practices, nurses must either coax or force him to shower. As a result, neither the cells nor the inmates are kept clean. Uneaten food and utensils remain in the cells for hours after mealtimes. Inmates abide in these conditions for times ranging from overnight to several weeks. Testimony of Ms. Flateau, Ms. Shoaf and Ms. Boyle.

Both plaintiffs' and defendants' witnesses discussed double-celling from the psychiatric viewpoint. The prison has a policy against housing Farview returnees in double cells. A psychological counselor ultimately decides which men will be double-celled, based on recommendations from the prison staff, including psychiatrists.

Dr. Pass opined that Clinic psychologists have set up adequate screening procedures to determine a new inmate's fitness for double-celling. Usually each inmate is processed within 3 hours of his arrival at SCIP. An evaluator interviews the inmate, observes him, reads any available records, and asks the man questions devised under State guidelines. Dr. Pass conceded that approximately 10% of the inmates lie about their past history for violence or homosexuality.

Dr. Thomas participates in the double-celling decisions. He stated that some inmates function better when double-celled because they need companionship; others may become psychotic, demonstrating a syndrome known as "homosexual panic."

Dr. Thomas described this syndrome as a situation in which the presence of another man in the cell leads to paranoia with a focus on the other man and his activities. This preoccupation produces anxiety and sleeplessness and results in regression. Psychiatrists are not able to determine how many inmates experience this kind of anxiety over a period of time.

Some tension exists between corrections staff and psychiatrists over double-celling decisions. Dr. Thomas recently wrote to Lt. McFetridge, SCIP housing officer, to clarify the psychiatrist's role in double-celling. A psychiatrist who believes an inmate should be single-celled writes medical orders in the man's medical *and* psychiatric records explaining why he must be single-celled. The psychiatrist is responsible for seeing that the order is followed. If, for some reason, a single cell is unavailable, the psychiatrist must admit the inmate to the infirmary. Within one week, another psychiatrist should concur in the decision to single-cell. Dr. Thomas stated that such orders are rare; he has written no more than 3 in the last 2 years. Defendants' Exhibits 5, 6.

On cross examination, Dr. Thomas stated that he doubts that his double-celling recommendations are followed. He advises inmates that his opinion may have no effect, and he believes that such statements discourage further inmate requests for single-celling.

Dr. Thomas agrees with Superintendent Petsock that inmates should remain in double cell arrangements that have proven successful, rather than be single-celled for the present and be faced with finding a compatible cellmate if the population expands.

Dr. Metzner testified that 70% of the states include a Special Needs Unit, sometimes called Protective Housing, in some of their correctional institutions. He noted that the SCIP Annual Mental Health Report for 1983 recommended such a unit. On August 27, 1987, Dr. Meacci proposed a Special Needs Unit for 100 inmates suffering from severe mental illness, mental or physical disability, and for recent Farview returnees. He described as "acute" the need for this unit, which would provide secure housing with intensive mental health treatment, as well as an alternative to the Farview "revolving door." Plaintiffs' Exhibit 224 at 2. Although prison administrative personnel widely supported the proposal, the Special Needs Unit was not established, apparently due to lack of funds.

However, in the summer of 1988, SCIP moved 35 to 40 inmates to A Range in the North Block, attempting to create a Special Needs Unit. Primarily because of the absence of qualified staff, this unit failed. Dr. Meacci identified the specific staffing problems as a deficiency in personnel train-

ing to deal with the special needs of the mentally ill and a lack of permanency in assignments, such that the corrections officers were unfamiliar with the inmates and their particular treatment requirements. In addition, no gates separated the unit from the general population, resulting in predation by homosexuals or assaultive individuals in A Range upon the vulnerable Special Needs Unit inmates. Finally, the dirty and dimly lit range was antithetical to a therapeutic environment.

Dr. Meacci testified that currently 130 inmates, among them 100 mentally ill, 10 to 15 mentally retarded and 10 to 15 physically disabled, would most appropriately be housed in a Special Needs Unit. He proposed several locations: 1) A Range, if it could be adequately staffed, cleaned, painted and modified to create treatment space; 2) one pod on the first level of B Block in the new building; 3) both pods on the third level of B Block; and 4) T Range in the South Block.

Dr. Metzner stated that SCIP should designate or construct an area separate from the North or South Blocks which would include adequate space for group therapy. In addition, he suggested the following minimum staffing for every 50 inmates housed in the unit: one psychiatrist for 20 hours a week; one psychologist, one psychiatric nurse, one social worker for 20 hours a week; one case manager; and one ward clerk.

Dr. Thomas stated that he opposes a Special Needs Unit if it is set up as an ill-defined hybrid unit and used as a "dumping ground" for the mentally ill. However, assuming that such a unit will be established, he recommended that the staff be chosen from among the "superb" officers currently working at SCIP. He opined that such a unit could be located in B Block but that it definitely should not be located in the North Block. Dr. Pass agreed that mentally ill inmates cannot be housed appropriately in the North Block because of inadequate supervision.

Dr. Metzner recommended that to implement an adequate mental health treatment plan, SCIP should improve the physical environment and increase the number of mental health staff. He suggested a range of programming, such as, outpatient treatment for those who can be maintained in the general population on medication and group therapy; inpatient treatment in an adequate infirmary for those experiencing acute episodes; and a protective environment, or special needs unit, for the chronically mentally ill who do not require infirmary care but who cannot survive in the general population.

In addition, Dr. Metzner suggested a centralized health care authority, located in Harrisburg, to negotiate the budget for all the state prisons. He also recommended a change in the administrative structure by adoption of one of two models: 1) one integrated medical care department; or 2) a medical department and a psychiatric department under one health care authority.

2. Medical Services

Plaintiffs' expert, Robert L. Cohen, M.D., Medical Director of the AIDS Program at St. Vincent's Hospital in New York City, is an internist extensively experienced in prisoner medical care. In May and June 1988, Dr. Cohen toured SCIP, reviewing medical records and interviewing prisoners and staff. Dr. Cohen noted that inmates are generally less solicitous of their own health than those in normal communities and, per capita, experience more problems related to heavy smoking, alcoholism and drug addiction. In addition, they suffer from asthma, heart disease and infectious pulmonary diseases that may be transmitted to the rest of the prison population. Plaintiffs' Exhibit 340.

a. *Staffing*

Only two physicians regularly attend to the medical needs of more than 1800 inmates at SCIP. Michael V. Gilberti, M.D., a general surgeon, works daily for 2 hours in the mornings doing administrative work and seeing inmates referred to him for surgical problems. He also performs surgery on inmates at Western Pennsylvania Hospital, Pittsburgh, Pennsylvania.

Arnold Snitzer, M.D., who is Board certified in Family Practice and also maintains a

private medical practice, works from 9:30 A.M. to 12:30 P.M., Monday through Friday, seeing approximately 50 inmates a day for routine medical problems. Although he never spends more than 3 hours a day on site, Dr. Snitzer will take calls daily on a 24 hour basis. Drs. Gilberti and Snitzer work only infrequently during weekends. In addition, Dr. Snitzer rounds on as many as 5 patients hospitalized at Western Pennsylvania Hospital. Each year, Dr. Snitzer takes 5 weeks of vacation or educational leave, during which time no other physician replaces him.

Thus, SCIP, an institution housing some 1800 individuals, many with serious problems, has no doctor present for 21 hours each weekday and none on weekends. Dr. Cohen, plaintiffs' expert in prison medicine, stated that, presently, the physician staffing is insufficient to provide for the serious medical needs of prisoners.

Dr. Cohen recommended a full-time medical director and 2 full-time physicians for duty from 8 A.M. to 4 P.M. each day and physician assistants to provide coverage for the remaining 16 hours a day. Considering time off for vacations and leave, Dr. Cohen opined that 8 full-time physicians are required to provide the necessary coverage. Plaintiffs' Exhibit 670.

Dr. Cohen stated that the present "dangerously inadequate" nursing staff cannot provide appropriate care for inmates, particularly because the nurses must fill the gaps in physician coverage for 21 hours a day, a task for which they are ill-suited. Plaintiffs' Exhibit 670. As a result of the overwhelming workload, stressed, tired and irritable nurses resort to calling in sick, thus further burdening the remaining staff. Plaintiffs' Exhibit 360.

Katherine Boyle, R.N., Nursing Supervisor at SCIP for eighteen years, and Michael Brewer, L.P.N., testified about the current staffing. Eight registered nurses and 6 licensed practical nurses work the following shift assignments: 6 A.M. to 2 P.M., a maximum of three R.N.s, most often two R.N.s with four L.P.N.s, and sometimes only one R.N.; 2 P.M. to 10 P.M., a maximum of three nurses, usually two R.N.s and one L.P.N. and occasionally one R.N. and two L.P.N.s; 10 P.M. to 6 A.M., one R.N., or occasionally two R.N.s and no L.P.N.s. James Wigton, Deputy Superintendent for Treatment, testified that he has unsuccessfully petitioned the Department of Corrections for three additional registered nurses.

Nurses work in 3 duty capacities: in the infirmary, in the medication room and on block duty. Block duty includes delivering medications to the·blocks and the restrictive housing unit. If 4 nurses work a shift, 2 of them distribute medications. Testimony of Mr. Brewer. Overtime to cover for another nurse's vacation or leave time is sometimes voluntary, sometimes mandatory. Mr. Joseph Morrash, the Health Care Administrator, determines the amount of overtime. Nurses work overtime either from 2 to 3 times a week or from 3 to 4 times a week, totaling 24 to 40 hours every 2 weeks. Testimony of Gerry N. Wetzel, L.P.N., and Mr. Brewer.

Margaret Esposito, R.N., testified that the "quality and quantity of medical services drops to a dangerous level on the evening shift." Plaintiffs' Exhibit 358 at 6. Often only one registered nurse runs the pharmacy and handles emergencies on the blocks. The nurse is most often assisted only by 2 licensed practical nurses, one of whom remains in the second floor infirmary, observing a maximum of 29 patients, while the other remains on the blocks. She estimated that a nurse may answer as many as 7 emergency or sick calls each evening. It can require 3 or 4 minutes to reach an inmate's cell; the nurse averages 30 minutes away from the infirmary for each call.

Garnet Shoaf, R.N., testified that for 20 months, she has worked the night shift from 10 P.M. to 6 A.M. Two nights a week 2 inmate nurse's aides and a corrections officer assist her. The other nights only one inmate nurse's aide is available. The nurse's aides clean, handle supplies, observe inmates and watch intravenous infusions. She stated that she regularly cares for 20 to 28 patients, housed in the 4 wards, for serious medical illnesses and

terminal diseases. Normally, Ms. Shoaf remains in the first floor pharmacy during her shift, except for infirmary rounds, block calls and her lunch break.

SCIP keeps 3 copies of the Standing Medical Orders, written by Dr. Gilberti and published on May 9, 1989, where nurses can refer to them as needed. Dr. Gilberti has reviewed the Standing Medical Orders with the other contract physicians. The table of contents lists common conditions, diseases and injuries as well as more serious conditions, such as epileptic seizures, hemorrhage, heart problems and psychiatric emergencies. Defendants' Exhibit 13. Ms. Boyle is responsible for informing the nurses of the existence of the Standing Medical Orders. Testimony of Mr. Morrash.

The nursing staff also has access to a Manual of Nursing Procedures prepared at Massachusetts General Hospital in 1975 for use specifically in hospitals, not in prisons. Defendants' Exhibit 14. Three copies of this manual are kept in convenient places. Testimony of Mr. Morrash. The Court notes that the procedure described for cardiopulmonary resuscitation is outdated. Except for cardiopulmonary resuscitation and drug withdrawal policies, nursing protocols do not exist. The absence of protocols makes it difficult for nurses to know the bounds of their authority. Testimony of Gloria Flateau, R.N.

Dr. Cohen recommended that at least 2 registered nurses be on call at all times, one of which would supervise the infirmary. He suggested additions to the staff of 6 registered nurses and 15 licensed practical nurses.

John R. Belfonti, Assistant to the Chief of Health Care Services for the Pennsylvania Department of Corrections, stated by deposition that he conducts an annual management survey to evaluate operations at the prisons. He transmits recommendations to the Commissioner of Corrections. These recommendations are in turn transmitted to the prison superintendent for response and/or action.

The Department of Corrections maintains a Table of Organization, specifying positions that have been established for prison personnel. In addition to nursing positions, the Table of Organization provides for clerical staff. Mr. Belfonti uses the Table of Organization to identify staffing deficits and recommend that prison officials request additional personnel.

Deputy Wigton testified that at least one more clerk is required for the medical department. The Table of Organization provides for a position, but the Department of Corrections has repeatedly refused to fill it.

Before the January 1987 fire, 3 clerks worked in the records department. Since then the department has consisted of a civilian records clerk, who has worked there for 11 years, and an inmate clerk, who has been there for 16 years. The Department of Corrections has specified that inmates employed in health care services shall be used only in a janitorial capacity. Deposition of Mr. Belfonti. Mr. Morrash conceded that it is undesirable to have an inmate filing health records of another inmate; therefore, as soon as SCIP hires another civilian clerk, the inmate will not be permitted to do this work. A witness opined that 3 civilian clerks could maintain the necessary records. Testimony of Arnold Jerry, Medical Records Clerk.

b. *Medical Services Requirements*

Besides psychiatric and dental services, Dr. Cohen listed medical service requirements for prisons: 1) administration; 2) intake evaluation; 3) sick call system; 4) specialty care; 5) infirmary care; 6) medication distribution; 7) emergency services; and 8) miscellaneous services.

1) Administration

Dr. Cohen stated that SCIP's administration is entirely inadequate to ensure proper health care. Dr. Gilberti, the nominal medical director, is on site only 2 hours a day and assumes little responsibility for developing medical policies; Mr. Morrash, the Health Care Administrator since 1972, although medically untrained except as a naval corpsman, in reality supervises the day-to-day operation of the medical services.

The prison staff is not involved in any budgetary process. Plaintiffs' Exhibit 670. Mr. Morrash testified that the business manager prepares the budget without any input from the hospital administrator. Nevertheless, Mr. Morrash stated that "anything we need, we usually get." However, he could not explain, for example, why no effort has been made to obtain an additional physician or to find physician coverage for vacation and leave times.

The administration has not established a medical quality assurance program for the prison. The Department of Corrections conducts annual reviews; however, these evaluations serve only administrative, rather than health care quality, purposes.

Even if the medical staff desired to institute a quality assessment program, no individual capable of fulfilling this function is presently on site, nor can current medical, nursing or administrative staff find time for this process. Testimony of Dr. Metzner and Deputy Wigton; Plaintiffs' Exhibit 670.

Moreover, the health care staff does not critique or even minimally evaluate care or recommend appropriate improvements in services. For example, Dr. Snitzer did not know if an emergency plan exists. Except for monthly medical reviews and a monthly blood sugar procedure, few protocols exist for the management of chronic diseases.

No regular medical staff meetings are held. Drs. Snitzer and Gilberti rarely meet to discuss programs or policies. Mr. Morrash fills out forms evaluating Dr. Snitzer and assesses credentials. Although Dr. Snitzer reads the nurses' notes on patients, he does not otherwise evaluate the nursing staff.

Periodic staff meetings for nurses were held by a former nursing director, but Ms. Katherine Boyle, the current Nursing Supervisor, does not convene any meetings. At a staff meeting sometime last year, Mr. Morrash and Ms. Boyle were informed about communication characterized by Mr. Brewer in May 1988 as "lousy." Since then, even though Mr. Morrash emphasized the need for better reporting, communica-

tion has not improved. Testimony of Mr. Brewer.

Ms. Esposito opined that a written record to communicate between shifts would be appropriate, however, no such record or log exists. Procedure requires that the day shift charge nurse give an oral report to the nurses arriving for the evening shift. Usually the registered nurses do communicate with each other about the patients, but the R.N.s often fail to relay information to the licensed practical nurses. As a result, an L.P.N. may hear about a necessary dressing change or other required treatment only from the inmate himself. For example, if the day nurse fails to dispense a medication, the evening nurse customarily will give it to the patient. However, Mr. Brewer reported an occasion in which the evening L.P.N. did not hear until the next day that the patient had not received medication during the day shift, and thus, that he should have provided it. Mr. Brewer estimated that reporting failures occur 3 times a week in the blocks.

Several witnesses testified about the condition of the medical records. If an inmate signs a permission slip, SCIP will request the man's medical records from doctors, hospitals and other institutions. Generally, the records are not available at the time the inmate transfers into SCIP. Testimony of Dr. Snitzer.

In his examination of the medical records, Dr. Cohen found that although charts contained specific treatment orders, they lacked documentation of inmate complaints, examinations or clinical interactions. Records of intake examinations were deficient in histories of medical problems and documentation of physical examinations, psychiatric evaluations and laboratory test results. Thus the records fail to aid in the diagnosis or treatment of severe medical problems.

Mr. Morrash testified about efforts to improve doctors' documentation of patients' medical conditions to show that doctors have visited patients daily, observed them and questioned them about their medical problems. On cross examination, Mr. Morrash conceded that doctors are not

charting every day as desired. He had reviewed only one of Dr. Snitzer's charts that included daily notes.

Department of Corrections officials from Camp Hill annually evaluate SCIP for various administrative aspects of health care. A Management Review Checklist for Correctional Health Care Services, Plaintiffs' Exhibit 346, was prepared on May 3 & 4, 1988 as a result of the survey. Although the checklist is unsigned, Mr. Morrash testified that Mr. Belfonti conducted the survey and prepared the checklist.

Mr. Belfonti identified the following staffing problems in the Annual Management Review of May 3 & 4, 1988. The report defines SCIP's minimum Table of Organization manpower requirements as 26 positions. Although to achieve the minimum, SCIP has requested 3 additional registered nurses, 2 additional dental assistants and one additional clerk, the Department of Corrections has failed to fill these positions. Mr. Belfonti recommended one additional clerk to cover administrative deficiencies.

On May 17, 1988, the Deputy Commissioner of Programs, Erskind DeRamus, stated that the Management Review revealed 11 areas of discrepancies and 15 areas of critical comment. Of these, 4 discrepancies and 3 critical comments are directly attributable to a shortage of personnel; 3 discrepancies and 3 critical comments are indirectly attributable to insufficient personnel. Plaintiffs' Exhibit 346.

### 2) Intake Evaluation

Dr. Snitzer conducts 90% of the intake physicals. Before the doctor sees an inmate, a nurse records the man's medical history, usually within hearing of waiting inmates, and completes laboratory tests. Dr. Snitzer examines the inmate in the presence of 3 or 4 other inmates. Dr. Gilberti conducts 10% of the intake physicals. In addition, he examines inmates over 40 years old for prostatitis.

Dr. Snitzer testified that the inmate clerk customarily provides the patient's chart but asserted that the inmate does not read it. The nurse takes a history and conducts preliminary testing that includes electrocardiogram and vision, hearing and blood pressure findings. For patients over 35, the nurse asks about past cardiac problems and does blood and urine testing. SCIP does not do routine AIDS testing; either the doctor must order, or the inmate must request, this test. The nurse will note any specific medical problems on the form that the doctor receives before he examines the patient. Dr. Snitzer stated that 80% of the forms indicate that the inmate enjoys generally good health.

Dr. Snitzer stated that during the physical examination, he observes gait, examines the eyes, ears, nose and throat, but does not auscultate the chest. The doctor performs visual rectal examinations for hemorrhoids or perianal cysts and visual genital examinations for hernias; if he views a mass, he dons a glove and examines digitally. He refers patients with suspected hernias to Dr. Gilberti. He does internal rectal examinations only if the inmate complains of specific pain. Dr. Snitzer testified that he will examine the prostate if the inmate has a complaint; however, he believes "they are usually too young" to have prostate disease.

Except to touch the ear to insert an otoscope, Dr. Snitzer testified that he generally does not touch inmate patients. Mr. Wetzel stated that since he rarely touches an inmate, the prisoners refer to Dr. Snitzer as "Dr. No Touch."

Dr. Snitzer reported that he spends approximately 3 minutes performing a physical. Dr. Cohen commented that a physician should take 15 to 30 minutes to do an intake physical examination.

### 3) Sick Call

Over a period of 2 hours, Dr. Snitzer sees approximately 50 inmates daily at general population sick call. He examines an inmate in the presence of perhaps 8 others in a large unpartitioned room. Dr. Cohen commented that a physician should spend an average of 15 minutes for each patient at sick call.

Dr. Cohen opined that medical care for inmates in the restrictive housing unit is not adequate. Dr. Snitzer conducts sick

call by looking at the inmate through the mesh window in the cell door. If the noise level, described as a "pin ball effect," is too high, the doctor leaves because he cannot hear the inmate's complaint.

When a nurse is summoned to the restrictive housing unit for sick call, a "white hat" from the security staff must accompany the nurse into the cell. Although white hats are stationed throughout the prison, none remains in the new blocks; the nurse often must wait as long as 12 minutes for one to appear. Mr. Brewer stated that although he experiences delays in obtaining assistance, that does not adversely affect his decision to enter the cell.

Because of the shortage of corrections staff, these inmates cannot be taken to the infirmary for examinations, even if the doctor requests it. In the last 2 or 3 months, podiatry and psychiatric services have been provided on the unit. Testimony of Mr. Wetzel.

Regarding the general attitude of prison patients, Dr. Snitzer observed that their cooperation with medical recommendations varies, for example, only 50% comply with prescribed diets, inmates smoke against advice, and those on weight reduction regimens are least cooperative. He noted that inmates show resentment toward prison staff and doctors. Dr. Snitzer stated that inmates in disciplinary custody complain the most; he indicated that the "lifers" in the restrictive housing unit rarely request sick call.

### 4) Specialty Care

Dr. Snitzer stated that if he identifies a sufficient number of patients, he will refer them to an orthopedist, a urologist, and a neurologist on a contract basis. Until two years ago, an ear, nose and throat doctor regularly saw inmates, but none is available now. Mr. Morrash testified that the medical services represented on site include orthopedics, psychiatry, urology, neurology, podiatry, radiology and physical therapy. Inmates are referred to outside services for eye, ear, nose and throat problems and for cardiology, plastic surgery, prosthetic devices and various testing services.

Mr. Morrash stated that no limits are placed on the type of referral services; however, he conceded that no dermatologist has visited the prison since 1987, despite the inmates' need for these services.

No cardiologist visits SCIP; Dr. Snitzer reads the electrocardiograms, using a computer-assisted machine. Dr. Cohen testified that some electrocardiograms interpreted as "normal" by Dr. Snitzer did, in fact, show abnormalities. X-rays are done at SCIP and contracted out for a radiologist's interpretation. SCIP obtains x-ray results in 5 to 6 days. Dr. Snitzer stated that x-rays are not routinely taken during intake physicals because they are "not medically rewarding."

SCIP refers inmates to the following hospitals: St. John's Health & Hospital Center, Bellevue Suburban Hospital, Allegheny General Hospital, Western Pennsylvania Hospital, Mercy Hospital, Veteran's Administration Hospital, and Eye & Ear Hospital, all of which are located in Pittsburgh, Pennsylvania or its suburbs. Testimony of Mr. Morrash.

### 5) Infirmary Care

The infirmary is not intended as a fully equipped hospital. It ordinarily has 17 or 18 patients in 4 wards, one reserved for medical and surgical patients, 2 for psychiatric patients and one for inmates recovering from hospitalizations. The infirmary also includes 2 observation cells, each of which accommodates one psychiatrically ill inmate. When extra cots are placed in the center of the medical ward, the infirmary population rises to 23 or 24 patients. Testimony of Ms. Boyle. If the infirmary is overcrowded, any inmate not experiencing an emergency will be listed to see the doctor the following day. Testimony of Ms. Esposito. Dr. Cohen stated that 18 infirmary beds are insufficient for 1800 inmates; he opined that 30 to 50 beds would approximate the need.

A smaller temporary modular infirmary will be completed soon to accommodate patients while the old infirmary is demolished and replaced. Although SCIP officials anticipate that construction of the new infirmary will take 2 years once work has be-

gun, no one can estimate a starting date. Testimony of Deputy Wigton.

Mr. Belfonti found that the medical staff has ignored a Department of Corrections' requirement that infirmary patients be seen every day by a physician, who must record his findings on the Doctor's Progress Report. Moreover, medical doctors have refused to see psychiatric patients. Mr. Belfonti recommended that psychiatric patients be seen by a psychiatrist for 6 days a week and by a medical doctor on the seventh day when no psychiatric coverage is available.

Dr. Snitzer spends 5 to 10 minutes daily rounding on 4 or 5 medical ward patients. He does not visit psychiatric patients unless a medical condition requiring attention has been identified. He states that from day to day, no problems arise with the chronically ill patients.

No documentation substantiates Dr. Snitzer's daily visits in the infirmary. Plaintiffs' Exhibit 349 at 53. While testifying, Dr. Snitzer could not recall complaints about failure to chart. He stated that he finds it unimportant to document anything that does not change. However, he noted that documentation has improved because "it looks better on the record if you do."

### 6) Medications

The night shift nurse spends more than 3 hours each night except Sunday labeling drugs and placing them in bins for dispensing the next day. Testimony of Ms. Shoaf. Ms. Shoaf stated that she prepares and labels the entire day's insulin injections for the day nurse to administer. She testified that correct nursing practice requires that the administering nurse also prepare the insulin.

A nurse takes approximately one hour and fifteen minutes to dispense drugs from the pharmacy to the general population each day. Although procedure requires that the nurse identify the inmate by number, Ms. Esposito stated that she knows most of the inmates and asks only for the number of an unfamiliar inmate.

Those inmates not confined in lockup status receive medications at the pharmacy.

Licensed practical nurses distribute medications to the blocks. Approximately five and one-half hours are required to distribute medications in the restrictive housing unit. Testimony of Mr. Wetzel and Mr. Brewer.

The nurses carry medications in a basket to the new cell block. Drugs are enclosed in blister packs labeled with the inmate's name. The nurse dispenses the medication from the pack into a cup and passes it through a slot in the cell door. Mr. Brewer testified that all medications, including psychotropics, are distributed this way. Although nurses have been required since a recent suicide attempt, Plaintiffs' Exhibit 288, to observe ingestion of a drug, in reality, all the nurse can do is to make sure the inmate gestures towards his mouth and drinks water. Most often the nurse cannot see the inmate clearly through the mesh screen of the cell door. According to Mr. Brewer, of 48 cells in the restrictive housing unit, only one-fourth are well lit; in the remaining three-quarters of the cells, the lighting is "terrible."

On June 22, 1988, an extraordinary occurrence report named Mr. Brewer for improper medication dispensing procedures. Plaintiffs' Exhibit 364. When the corrections officer escorting Mr. Brewer on J Range was called away, Mr. Brewer proceeded to A Range to deliver medications. The returning corrections officer discovered Mr. Brewer placing drugs into small paper cups and throwing them into the cells, including cells from which the inmate was absent. Mr. Brewer continued distributing drugs in this manner even after the corrections officer called him to account. The officer collected the medications from the empty cells.

Mr. Morrash reported that Mr. Brewer had committed the following violations: 1) He delivered bedtime medication approximately two hours before the prescribed time; 2) He left medication unattended in the cells; and 3) he placed medication in an unlabeled container. Plaintiffs' Exhibit 364(B).

Mr. Brewer admitted the infractions, but offered as an excuse the stress involved

with giving drugs to more than 120 patients in the North Block and in the new building. Plaintiffs' Exhibit 364(A). At an administrative hearing, Mr. Brewer stated that he had complained in the past that "there were too many inmates, that he could not be two places at once and that he was so stressed he could not think." At a staff meeting, after Ms. Boyle stated that the nursing staff did not have enough help, Mr. Morrash told Mr. Brewer to "do the best you can." Testimony of Mr. Brewer.

On May 25, 1988, Mr. Brewer wrote a letter to David Owens, Commissioner, Pennsylvania Department of Corrections, expressing dissatisfaction that nurses, although they serve an ever-increasing population with insufficient staff, do not receive "stress pay." Plaintiffs' Exhibit 363.

Every day inmates complain that they have not received their medications. Although procedure requires that the nurse sign off the time she administers each drug on the Medication Administration Record, staff shortages make proper charting impossible most of the time. Dr. Thomas articulated disapproval at a March 13, 1989 staff meeting that nurses are not recording medication administration. Plaintiffs' Exhibit 764.

When an inmate complains that he has not received a medication, Ms. Shoaf checks the inmate's bin and the Medication Administration Record. She then checks the doctor's order. If she cannot determine whether the inmate has received a drug, she refuses to give it but reports a possible omission to the daylight shift.

SCIP maintains a Psychotropic Inventory Report that Mr. Morrash sends to the Commonwealth. Perhaps 250 to 270 inmates receive psychotropic medication. Ms. Shoaf stated that in calculating this number, she counted only those drugs signed off on the Medication Administration Record; therefore, considering uncharted medicines, she cannot know how many inmates actually receive psychotropics. However, she stated that since she labels and stocks the drug bins, she knows that more inmates receive psychotropics than are reflected in the count.

Mr. Morrash, who is not medically licensed, reports that he orders only over-the-counter medications for inmates. He will take a medical order for a prescription medication over the telephone to provide continuity until the inmate sees a doctor.

### 7) Emergency Services

Mr. Belfonti determined that prison officials have not adequately prepared for a medical disaster at SCIP. He proposed that an institution-wide mock disaster drill include evacuation by stretcher from the North Block to the infirmary.

On an average of 2 times a week, nurses respond to emergencies in the blocks. Considering the narrowness of the tier, the open steep stairways, and the difficulty in removing the inmate from the cell itself, 5 or 6 people require approximately 10 minutes to remove a patient from the top tier out the block door. Testimony of Mr. Brewer.

As many as 5 times a shift, inmates request block calls for complaints of abdominal and chest pain, as well as skeletal injuries and common colds. Often, several emergencies may occur simultaneously; therefore, the nurse prioritizes the calls. During block calls, the nurse must leave seriously ill infirmary patients medically unsupervised. For example, Ms. Shoaf stated that she attended a profusely bleeding inmate who had attempted suicide in the blocks, abandoning in the infirmary a gravely ill cardiac patient whose oxygen was running low.

Mr. Morrash testified that he generally does not order inmates admitted to outside hospitals, but he will recommend this action to a nurse. He stated that, "in an emergency, everyone helps out."

### 8) Miscellaneous Services

Several witnesses testified about supply shortages and unsatisfactorily maintained equipment.

From May 13, 1986 until November 18, 1986, no optometric examinations were performed because a fire had destroyed the optometrist's chair and refracting equipment. Although inmates were denied routine eye examinations during this period,

those with serious eye problems were referred to outside optometrists.

Deputy Wigton testified that there had been a 6 month delay in replacing the optometrist's chair and refracting equipment because bureaucratic snarl typically complicates major purchases of capital equipment.

Ms. Shoaf testified for plaintiffs that complaints to Mr. Morrash about equipment and supplies "fall on deaf ears." Until 1985, SCIP had a serviceable defibrillator; when Dr. Cohen visited, he found that the defibrillator in the infirmary was not functional. He recommended that all machinery be in good working order. Ms. Esposito testified that she and one other nurse are trained to use a defibrillator during a cardiac emergency.

SCIP owns 2 suction machines, one of which is kept in the operating room. Ms. Boyle testified that both are kept in working order. These are used, for example, to remove secretions from a patient's throat. However, on October 18, 1987, Ms. Flateau sent an extraordinary occurrence report to Mr. Morrash, reporting that a suction machine was in disrepair. Plaintiffs' Exhibits 762, 763. Mr. Morrash countered that the nurses did not know how to operate the machines. He stated that after nurses complained about a machine being out of order, Ms. Boyle trained the nurses on the use of the machine.

Three small oxygen tanks, frequently empty, are kept in the first floor operating room. A maximum 20 bottle supply is stored in a basement area. Problems exist with expeditious restocking of oxygen and the complementing supplies: masks and nasal cannulas. Ms. Shoaf recommended that whoever uses the oxygen should replenish it since, in an emergency, when oxygen is most likely required, little time is available to search the storeroom. Mr. Morrash averred that although supplies have been dangerously low at times, the infirmary has never been completely without oxygen.

Ms. Esposito testified that the infirmary is not equipped with a resuscitation apparatus that will protect personnel against infectious diseases. As a result, an AIDS patient did not receive mouth-to-mouth resuscitation until he reached a hospital.

The infirmary is equipped with 2 sets of bedrails that do not fit all of the beds. Therefore, to accommodate an inmate who requires bedrails, nurses must shift patients from one bed to another.

Plaintiffs' witness, Ms. Shoaf, testified that plastic and cloth mattresses are stained, ripped and odiferous. She asserted that she has "not seen a good one yet." However, Ms. Boyle stated no problems exist with mattresses except ones in the observation cells that are not reused.

Ms. Boyle stated that linen shortages are reported to her every 4 to 6 weeks. Procedure requires that each inmate admitted to the infirmary be given a complete set of bedding, but often none is available. Ms. Shoaf reported that nurses substitute paper sheets or blankets for cloth sheets. Ms. Boyle testified that she fills orders for sheets within one day. Ms. Shoaf stated that nurses must wrap patients in sheets when shortages in pajamas occur. Ms. Boyle conceded a problem with stocking pajamas that "walk away on everyone who leaves."

### c. *Specific Medical Cases*

Dr. Snitzer testified for defendants about particular SCIP inmates with serious medical illnesses. Plaintiffs presented Dr. Cohen's rebuttal testimony. Initials were used to protect confidentiality.

Dr. Snitzer was asked about JH. He stated that JH transferred from the State Correctional Institute at Graterford ("Graterford") with a history of coronary artery disease. On admission, his electrocardiogram, enzymes and cholesterol reportedly were normal. Dr. Snitzer permitted JH to continue on a medication prescribed before his admission to SCIP. Dr. Snitzer described this man as a "plump and happy" inmate who did not complain of chest pain.

On cross examination, Dr. Snitzer stated that he had not treated JH from 1984 to 1988, observing that JH "only wanted to come in and get his stuff." Although Dr. Snitzer said he does not necessarily allow patients to continue medications without

evaluating the need, he asserted that JH insisted on taking previously prescribed medications. In addition, JH offered no complaints.

On rebuttal, Dr. Cohen opined that, in the absence of symptoms, Dr. Snitzer improperly continued old prescriptions because the patient demanded them. Dr. Cohen stated that if JH did not have heart disease, a potential for the drugs' severe side effects existed without any balancing benefit. He reasoned that the doctor should document a basis for renewing a prescription, particularly because the patient's condition may have changed since the drug was originally ordered or because another doctor may have prescribed inappropriately.

Dr. Snitzer testified about JB, an uncontrolled diabetic who refused 68 out of 80 American Diabetic Association diets during January 1989. Monthly blood sugar testing had been ordered for JB.

On cross examination, Dr. Snitzer stated that JB arrived from Allegheny County Jail on January 1, 1988 with a prescription for insulin. Although on January 2, SCIP personnel verified the insulin dose with Jail personnel, JB did not receive his first dose of insulin until after his intake physical on January 19, 1988. Not until January 20, 1988 did the first blood sugar reveal an elevated level of 678. Dr. Snitzer explained the delay, stating that because JB is a drug addict, Dr. Gilberti had to perform a surgical procedure to obtain the blood for testing. Notwithstanding the unusually high blood sugar, Dr. Snitzer failed to adjust the insulin dose. Asked about possible dehydration with reference to the specific gravity of JB's urine, Dr. Snitzer stated that diabetics' urines demonstrate wide swings in specific gravity. He asserted that he "treat[s] the patient, not the numbers."

On rebuttal, Dr. Cohen opined that a blood sugar of 678, although possible, is not common without dehydration: high blood sugar is a clue to dehydration. Dr. Cohen also remarked that the specific gravity of 1.039, reported on January 19, represented a significant concentration, defini-

tive of dehydration. Dr. Cohen insisted that JB's pulse of 111, while not in itself remarkable, in combination with the blood sugar and specific gravity readings, signified dehydration.

Dr. Cohen suggested treatment appropriate for JB: 1) medical monitoring in a hospital; 2) administration of intravenous fluids for several days before giving oral fluids; and 3) insulin until glucose returns to normal levels.

EG, a non-compliant, but fairly well controlled, diabetic transferred to SCIP from Farview in June 1987. Dr. Snitzer stated that EG had refused his diabetic diets. However, the doctor did not document this refusal despite his awareness that EG was psychiatrically ill.

On cross examination, Dr. Snitzer conceded that he reordered oral hypoglycemics without obtaining a blood sugar. On rebuttal, Dr. Cohen stated that hypoglycemic drugs are potentially dangerous because they can cause low blood sugar that leads to irreversible serious brain damage. Dr. Cohen recommended monitoring oral hypoglycemics on a monthly basis, rather than at 4 month intervals, as occurred in this case.

Plaintiffs elicited testimony about the following inmates who died while incarcerated at SCIP.

Dr. Snitzer testified that PB, "a generally manipulative and uncooperative diabetic," arrived from Farview in August 1986, taking medication for diabetes. The doctor stated that his blood sugars, ranging from 34 to 295 showed fair control of his condition.

On rebuttal, Dr. Cohen stated that PB, who had pleaded for psychiatric help, also demonstrated classic symptoms of ketoacidosis, such as severe abdominal pain, nausea, vomiting and inability to eat. Dr. Cohen identified three deficiencies in the care of this patient: 1) symptoms and signs indicated he was developing ketoacidosis and required intravenous glucose and insulin of which he was deprived; 2) laboratory testing should have been done—routinely on a weekly to monthly basis, and when

symptomatic, four times a day—to determine the blood sugar and the pH of the blood; and 3) lack of coordination between the medical and psychiatric services to treat a patient who was not eating due to mental illness rather than uncooperativeness.

JW arrived at SCIP on April 11, 1987 and died of lung cancer on December 17, 1987 at age 65. Although on admission, SCIP had requested his medical records from a Youngstown, Ohio hospital, the records did not arrive at SCIP until sometime after May 22, 1987. After a review of the records revealed the presence of a pulmonary nodule, JW was given radiation therapy beginning in July 1987. Dr. Snitzer stated on direct examination that, based on the available records, JW's death was not preventable: "These patients don't last six months."

On cross examination, Dr. Snitzer conceded that although the intake physical indicated that JW had difficulty breathing, a history of chest pain since 1983, and a history of tuberculosis, no chest x-ray was done until October 10, 1987, six months after his admission.

On rebuttal, Dr. Cohen stated that a chest x-ray was mandatory on this patient because of his age, his history of difficulty in breathing and his treatment with Digoxin, a medication frequently given for congestive heart failure which involves heart enlargement. An x-ray on admission to SCIP would have revealed the mass in the left lung that was not discovered until the medical records arrived from the hospital. Dr. Cohen disagreed that the lung mass was inoperable. Although lung cancer has a bad prognosis, Dr. Cohen stated that a bronchoscopy and a biopsy should have been done to determine the presence of a solitary mass, for which surgery is the primary treatment.

Dr. Snitzer testified that HF was admitted to SCIP on July 24, 1984, at which time his physical and x-ray findings were normal. His record showed the following course of treatment:

| | |
|---|---|
| 1985–86 | Saw a dermatologist for a skin problem. |
| 1986 | An over 40 physical revealed coronary artery disease for which he refused medication. No chest x-ray was taken. |
| 8/86 | Reported an upper respiratory infection. |
| 9/86 | Saw a dermatologist for a skin problem. |
| 9/13/86 | Complained of dizziness. |
| 9/14/86 | Complained of chills, fever and shortness of breath. |
| 12/11/86 | Reported to sick call. |
| 12/15/86 | Did not show for sick call appointment. |
| 12/16/86 | Chest x-ray normal and lungs clear. |
| 12/29/86 | Weight loss reported—down to 110½ pounds from 125 pounds on 8/8/86. |
| 12/31/86 | Admitted to infirmary. Temperature of 100 degrees; weight loss; anorexia; given intravenous antibiotics. |
| 1/1/87 | AIDS test done. |
| 1/7/87 | AIDS test returned positive. |

On cross examination, Dr. Snitzer stated that he did not investigate the cause of HF's weight loss. He stated that a radiologist had read the chest x-ray as showing pulmonary edema with no signs of pneumosistic carinii pneumonia, a pneumonia typical of AIDS patients. Although he could cite no medical authority for his opinion, Dr. Snitzer commented that AIDS patients rarely live for 2 years after they develop this pneumonia, and that whether AZT, a drug for treating AIDS, prolongs life is debatable. Dr. Snitzer ordered supportive care after Dr. Gilberti had said that "nothing could be done."

On rebuttal, Dr. Cohen noted that although Dr. Snitzer had consistently opined that HF suffered from heart disease, his symptoms of chills and a fever of 104 degrees always related to infection rather than heart disease. Dr. Cohen stated that severe weight loss indicated a critical illness. Reading the same x-ray that Dr. Snitzer had interpreted as normal, Dr. Cohen opined that the x-ray showed interstitial infiltrates of the left lung indicating pneumonia. The record did not document suspected pneumonia.

In retrospect, Dr. Cohen recommended the following course of care for HF: 1)

treatment with a broad spectrum antibiotic rather than the Keflex that was given; 2) blood gases and blood culture to identify the organism; 3) hospital care. Dr. Cohen opined that this patient could have survived this first episode of pneumonia: given early diagnosis, treatment for 24 hours with the appropriate drug would have reduced the fever; 10 days of treatment could have sufficiently controlled the disease. Commenting that diagnostic efforts were inadequate, Dr. Cohen disagreed that AIDS patients rarely live for 2 years after surviving the first episode of pneumonia; while most die within 2 years, many do not.

### 3. Dental Services

Deputy Wigton testified that SCIP provides minimal levels of dental service because of inadequate staffing. In 1980, with a maximum population of 1000, the dental staff included one full-time dentist, one part-time dentist and 3 assistants. In 1989, with a maximum population of 1829 to date, the dental staff has been reduced by 2 assistants. Although Deputy Wigton has requested an additional dentist, 2 dental hygienists and clerical support, he has done so reluctantly because he suspects he will receive a negative answer. Deputy Wigton noted that the Department of Corrections provides for these positions in its Table of Organization, but nevertheless, they remain unfilled.

On March 8, 1988, A.O. Schwarm, staff dentist, wrote to Superintendent Petsock, pleading for 2 full-time dentists and a hygienist, stating that SCIP does not comply with the Governor's Task Force Report mandate to provide the "highest quality of health care" to inmates. Plaintiffs' Exhibit 427.

The present staff handles the dental needs of all SCIP inmates plus the 2600 inmates that are processed through the Clinic each year.

SCIP inmates routinely experience delays of 4 to 6 weeks or more in obtaining dentures. Inmates at Graterford manufacture the dentures, which often are ill-fitting and of poor quality. Plaintiffs' Exhibit 431. In response to inmates' grievances chronicling

delays in all types of dental care, prison employee, Mr. Thomas Siverling, consistently responded that each inmate must remain on a one-year waiting list, regardless of the seriousness of his condition.

### B. *Legal Analysis*

The Constitution obliges the government to provide medical care for those whom it is punishing by incarceration. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' (citation omitted), proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291. *See also Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979) (holding that a violation of the eighth amendment results from "deliberate indifference to a prisoner's serious illness or injury.")

█ For purposes of a civil rights action under Section 1983, physicians are persons acting under color of state law when a state employs them to treat prisoners. *West v. Atkins*, 487 U.S. 42, ——, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988).

█ We draw no distinction between psychiatric and medical care for eighth amendment purposes. The United States Court of Appeals for the Third Circuit has held that psychological or psychiatric care at a jail is constitutionally inadequate if inmates with serious mental illnesses are effectively prevented from being diagnosed and treated by qualified professionals. *Inmates*, 612 F.2d at 763. *See also Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir.), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). The state must provide to prisoners a level of health services reasonably designed to meet routine and emergency medical, dental and psychological or psychiatric care. *Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

The United States Court of Appeals for the Third Circuit has recently determined that analysis under the deliberate indiffer-

ence standard does not differ whether it is applied to pretrial detainees under the fourteenth amendment or to convicted prisoners under the eighth amendment. *Boring v. Kozakiewicz,* 833 F.2d 468, 472–73 (3d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988). Thus, our cases analyzing constitutional violations with regard to medical care for pretrial detainees are equally applicable to sentenced prisoners.

Courts have described deliberate indifference variously, but that term at least encompasses acts or omissions so dangerous in respect to health or safety that the defendant's knowledge of a large risk can be inferred. *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 558 (1st Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988).

Prison officials show deliberate indifference if they prevent an inmate from receiving recommended treatment or deny him access to medical personnel capable of evaluating his need for treatment. *Inmates,* 612 F.2d at 762.

The test enunciated in *Estelle v. Gamble* requires not only that prison authorities demonstrate deliberate indifference; the prisoner must have also suffered a serious illness or injury. *Boring,* 833 F.2d at 468. A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Laaman v. Helgemoe,* 437 F.Supp. 269, 311 (D.N.H.1977).

## C. *Rx*

### 1. Psychiatric Services

■ The American Medical Association ("AMA") sets three conditions that must be met for adequate psychiatric treatment at a jail: 1) a safe, sanitary, humane environment as required by sanitation, safety and health codes of the jurisdiction; 2) adequate staffing and security to inhibit suicide and assault (that is, staff within sight and sound of all mentally ill inmates), and 3) trained personnel to provide treatment and close observation. AMA, *Standards for Health Services in Jails,* at 10 (1981). Under *Boring,* we also apply these standards to conditions at SCIP.

Officials at SCIP have violated the eighth amendment with respect to psychiatric and psychological care in at least two ways: they have failed to provide adequate staffing; they have failed to maintain an environment conducive to treatment of serious mental illness.

During the trial, plaintiffs repeatedly demonstrated that constitutional violations at SCIP are primarily traceable to staffing problems. Not only does SCIP lack a numerically sufficient staff, but the present staff is inadequately trained for its overwhelming task.

As examples of a staff insufficient to meet serious psychiatric needs, we point to the following evidence on the record. Significant delays occur between requests for psychiatric consultations and actual interviews. Inadequate record-keeping restricts treatment and follow-up care. Professionals must borrow time best devoted to providing treatment to complete purely clerical tasks. And the staggering increase in the prison population without a proportionate increment in staff encourages hasty, rather than accurate, evaluations of an inmate's mental health status, particularly as it relates to risks of violence or homosexuality.

Notwithstanding the attempts to provide excellent care by the current staff psychiatrists and psychologists, the evidence demonstrates that SCIP has not kept pace with the need to hire personnel qualified to support these professionals. For instance, none of the nurses has been trained in psychiatric nursing. Moreover, despite the recognized need and Dr. Thomas' repeated requests for psychiatric social workers, the Commonwealth has not filled these positions. We note that the corrections staff effectively reports psychiatric incidents to the psychology department once they occur, but none of these officers has been trained to prevent psychotic episodes by recognizing the signs and symptoms of an impending illness before it intensifies.

Gross staffing deficiencies establish deliberate indifference to prisoners' health needs. *Ramos*, 639 F.2d at 574. We find that the staff providing psychiatric/psychological services at SCIP is grossly deficient. Thus, we conclude that plaintiffs have established defendants' constitutional violations in this respect.

We want SCIP officials and the medical staff to have an opportunity to develop their own plan. Rather than make specific orders for staff changes or physical renovations relative to medical and psychiatric services at this time, we will direct prison officials to draft a plan or program reflecting the necessary personnel and physical changes and submit the plan to such expert consultant or consultants as may be designated by plaintiffs' counsel. The Commonwealth will pay the reasonable costs of such consultants.

Hopefully the parties will be able to reach agreement on the plan, which the Court will then review and order if the Court agrees. If the parties are unable to reach agreement, the Court will then make such orders as it deems necessary to bring SCIP into compliance with constitutional standards.

With this procedure in mind, we now make some suggestions, based on the testimony in this case, which the parties should seriously consider.

Dr. Pass recommended that SCIP provide 24 hour coverage by a psychiatrist, and an additional psychologist, counselor and clerical worker. Dr. Pass has requested 10 to 15 more hours of psychological services, for a total of 4 to 5 hours daily and 5 hours over the weekend. He emphasized the demand for services after 4 P.M.

We reiterate that Dr. Thomas has repeatedly requested psychiatric social worker services. He recommended that SCIP hire a chief social worker, assisted by 4 full-time social workers.

Dr. Metzner recommended that, in addition to psychiatric nurses, SCIP retain 2 additional full-time psychiatrists and 2 additional full-time psychologists.

We conclude that defendants should consider obtaining the services of a chief social worker, 4 full-time assistant social workers and hiring at least one clerical worker to serve the needs of psychiatrists and psychologists.

Defendants should, perhaps, hire an independent consultant to conduct a staffing study to determine the number and deployment of psychiatrists, psychologists, counselors and psychiatric nurses necessary to serve the current SCIP population. We suggest that the Commonwealth retain the services of the National Institute of Corrections for this purpose, as recommended by E. Eugene Miller.

Our visit to SCIP and plaintiffs' testimony revealed that the physical environment as it relates to psychiatric care is in shambles. Not only are the facilities malodorous, filthy dismal and crowded, but the atmosphere is oppressive and terrifying, especially to those weakened by mental illness. Dr. Metzner opined that this milieu, far from achieving the State's mandate to provide even a minimum level of care for prisoners, actually exacerbates the deterioration of those already suffering from psychiatric conditions.

We think it only makes sense that severely mentally ill inmates should be segregated from the general population. These inmates who randomly scream all night, talk loudly and laugh hysterically without apparent reason increase tension for psychologically normal inmates. In addition, such irrational behavior invites retaliation from impatient and stronger inmates. To maintain such persons in the North and South Blocks concocts a "recipe for explosion." *Cortes–Quinones*, 842 F.2d at 560.

Plaintiffs have introduced evidence that officials at SCIP have attempted, but failed, to segregate such inmates in a Special Needs Unit. Dr. Metzner testified that 70% of the states include such a unit in some of their correctional institutions. To meet constitutional requirements, SCIP, as the regional center for receiving, identifying and housing severely mentally ill inmates, should establish such a unit.

As noted, we recognize that the courts are not to " 'substitute [their] judgment on ... difficult and sensitive matters of institutional administration,' *Block v. Rutherford*, 468 U.S. 576, 588, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984), for the determinations of those charged with the formidable task of running a prison." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353, 107 S.Ct. 2400, 2407, 96 L.Ed.2d 282 (1987). However, to bring the psychiatric/psychological services at SCIP up to constitutional muster, we must, to some extent, define the unit based on recommendations of the professionals who have testified about it.

The Special Needs Unit should not be organized in either the North or the South Block. Even if Commonwealth officials erect gates to separate these mentally ill individuals from the general population, the physical design of the blocks will not permit segregated showers or separate exits; thus, the probability exists that these weaker inmates will continue to be accosted by predatory prisoners from the general population.

The Commonwealth should provide space in the Special Needs Unit for individual and group therapy in recognition that inmates assigned to this unit experience a continuing need for active therapy.

We do not expect a Special Needs Unit to become a "dumping ground" for those inmates requiring more intense treatment in a mental hospital such as Farview, especially in light of testimony that communications with Farview have improved recently. We would assume, however,. that the unit should accommodate Farview returnees who, for one reason or another, cannot successfully live in the general population. Specifically, personnel in the unit should monitor and assist those individuals who will not themselves take medication regularly, maintain normal hygienic practices, accept dietary restrictions, or report symptoms of illness.

Dr. Metzner suggested that for every 50 inmates housed in a Special Needs Unit, minimum staffing should include the following: 1) one psychiatrist for 20 hours a week; 2) one psychologist; 3) one psychiatric nurse; 4) one psychiatric social worker for 20 hours a week; 5) one case manager; and 6) one ward clerk.

In formulating the plan, the parties should determine the number of inmates which appropriately should be housed in a Special Needs Unit. Although we recognize that some overlap may occur between the general psychological services and the Special Needs Unit, at a minimum, full-time psychiatric nursing and clerical coverage should be provided in this unit, and corrections officers who are specially trained should be permanently assigned to the unit.

By far the most wanton and unnecessary infliction of pain we encountered on our visit to SCIP occurred in the psychiatric observation cells. Indeed, we did not even achieve a view of these cells, located down a narrow hallway at one end of the infirmary, or of the occupants. We were warded off by the overpowering stench emanating from the other end of the hall, as well as by warnings that the inmates might possibly throw feces at us.

Ms. Flateau described the "medieval conditions" of these cells: they do not have furniture; they are infested and filthy. These inmates are obviously too ill to properly care for themselves, even as to basic necessities of life, and SCIP personnel abandon them to vegetate and fester in despicable confinement.

Although we might well order these cells closed immediately, we choose here a more moderate course. Prison personnel may continue to maintain acutely ill inmates in these cells only if food is removed promptly after meals, the inmates are showered as often as acceptable standards of hygiene dictate and the cells are washed at least daily or more often as circumstances require. We recognize that these inmates pose particular problems for an overburdened staff; however, prison officials must find enough personnel and institute policy designed to meet constitutional standards of decency if they wish to use the cells at all.

### 2. Medical Services

We are aware that what is "ideal" from a psychiatrist's or physician's viewpoint

may be considerably more than that which is "adequate" from a constitutional standpoint.

Dr. Cohen, who criticized much of SCIP's medical program, is an internist with extensive experience working in penal institutions. He is not a physician speaking from an "ideal" perspective. We gave great weight to his testimony.

The Constitution does not guarantee a prisoner the treatment of his choice. *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988). Prison officials can meet their constitutional obligation by providing adequate services: "services at a level reasonably commensurate with modern medical science and of a quality acceptible within prudent professional standards." *United States v. De Cologero*, 821 F.2d 39, 43 (1st Cir.1987).

The "spectre of constitutional infirmity" has been raised by such deprivations as result from insufficient staff, unsanitary conditions, incomplete or inaccurate medical records, ill-serviced or substandard equipment and delays in filling requests for eyeglasses or prosthetic devices. *Newman v. Alabama*, 503 F.2d 1320, 1323, 1332 (5th Cir.1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975).

Plaintiffs offered evidence that only 2 doctors and a maximum of 8 registered nurses attend to the medical needs of more than 1800 inmates. Because Dr. Snitzer and Dr. Gilberti maintain approximately the same schedule at the prison, not more than 3 hours each weekday morning, SCIP inmates are deprived of physician services for at least 21 hours a day. The enormous workload for these 2 physicians forces them to undertake assembly-line treatment in an effort to see more inmates in less time.

The paucity of physician services overburdens the already "dangerously inadequate" nursing staff that must pinch-hit during crises which properly should be handled by a doctor. Dr. Snitzer testified that prison officials had retained an additional physician 8 years ago for a short time; Deputy Wigton testified that he has unsuccessfully petitioned the Department of Corrections for 3 additional registered nurses.

Despite this recognition that more staff is needed, SCIP officials have been unable to convince the Department to meet this responsibility.

As a further assault on the efficiency of the medical staff, Commonwealth officials have failed to provide sufficient clerical staff. Before 1987, 3 clerks worked in the medical records department. Since then, only one civilian clerk has worked there. SCIP officials have filled this gap by assigning an inmate to clerical duties—despite cautions against breaches of confidentiality and regardless of a Department of Corrections directive that inmates shall assume only janitorial duties.

We find that Commonwealth officials are deliberately indifferent to the serious medical needs of SCIP inmates purely by virtue of their failure to provide access to treatment through an adequate medical staff. We note that at least one court has approved as constitutionally satisfactory the presence of a licensed physician for 24 hours a day for 7 days a week. *Smith v. Fairman*, 690 F.2d 122, 124 (7th Cir.1982), *cert. denied*, 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983). As part of the psychiatric/medical plan, the parties should consider having SCIP obtain the services of one full-time physician immediately and fill without further delay the 3 positions currently listed in the Table of Organization for registered nurses. SCIP officials should also retire immediately the inmate clerk currently working in the medical records department and replace him with at least one civilian records clerk.

Filling these positions may provide only temporary relief to the overextended medical staff. To effect a more permanent solution, the prison administration should retain the National Institute of Corrections, or some other independent source, to analyze the medical staffing needs for the current population at SCIP.

The testimony revealed that merely adding physicians to the staff will not provide constitutionally adequate services. In addition to the reduced staff, the current medical department fails to properly administer the task of serving this enormous inmate

population. Although Dr. Gilberti presently serves as the nominal medical director, Dr. Cohen testified that Dr. Gilberti does not undertake the usual functions of that position. Therefore, SCIP should obtain a full-time medical director for its medical staff. We envision the medical director's duties to include organizing at least the following services: 1) medical quality assurance, including appropriate record-keeping; 2) evaluation of services and recommendations for improvements; 3) designing and updating emergency and treatment protocols; 4) providing inservice education and assessing credentials for the inhouse medical staff and the referral staff; 5) providing liaison with the nursing department; and 6) submitting budgetary requirements to the appropriate Commonwealth administrators.

Similar problems exist in the Nursing Department. At least for eighteen years since Ms. Boyle became Nursing Supervisor, no periodic nurses' meetings have been convened. The testimony revealed general disorganization of the nursing services in these respects: lack of communication between shifts, lack of training in equipment use, disputes about the availability of supplies and dissatisfaction about overtime requirements. In addition, Ms. Boyle does not supervise inservice education, nor has she devised nursing protocols to inform nurses of their responsibilities and the bounds of their authority.

In short, we see in the nursing administration a total disregard for good nursing practice. We do not wonder that the nurses respond to their overpowering workload, becoming stressed and tired, and, as a result, reporting in sick. We conclude that State officials' deliberate indifference to the serious medical needs of prisoners is reflected in their disregard for the effectiveness of nurses, as the inmates' primary health caretakers.

We find that presently the medical services are constitutionally inadequate. However, we anticipate that many of the problems will be solved by a sufficient and well-organized staff. Therefore in this part of the Opinion, we again will point out

the areas we want the parties to consider in formulating a plan. In keeping with our mandate to permit State officials the opportunity to remedy constitutional abuses in the first instance, we will not substitute our judgment for that of prison authorities unless we see a need after staff augmentation and reorganization has occurred.

Clearly, at this time, neither Dr. Snitzer nor Dr. Gilberti is performing thorough intake physicals. Dr. Cohen testified that, although currently doctors spend 3 minutes per physical examination, an intake physical requires at least 15 minutes.

Additionally, we credit testimony that Dr. Snitzer rarely touches patients and that he himself does not inquire or record whether they have any complaints. We find it difficult to believe that a physician can complete a painstaking examination without touching the patient. At this juncture, rather than suspecting that Dr. Snitzer has an aversion to the inmates, we will assume that the doctor does not touch patients because time and numbers frustrate his more noble instincts. We anticipate that with an increase in staff, Dr. Snitzer will be able to conduct complete physical examinations. We also presume that he will take time to ask inmates about their medical histories and complaints about symptoms.

We find that conditions are not better with regard to sick call. Here again, to see as many as 50 inmates daily, Dr. Snitzer must conduct only the most cursory investigation of illnesses. Although Dr. Snitzer reports that inmates are generally uncooperative about the state of their health, we observe that a physician's apparent unconcern and incommunicativeness may produce belligerent responses.

Sick call in the restrictive housing unit presents a personnel problem beyond the purely medical. Testimony revealed that the noise level prevents the doctor from informing himself of the inmates' complaints. Further, inmates cannot visit the infirmary because of insufficient corrections staff. We find, for these reasons, that inmates in prison segregated areas do not have adequate access to care. There-

fore, we will direct SCIP officials to provide for examinations on the unit or to increase the corrections staff so that inmates may be escorted to the infirmary.

We find that referral services are for the most part adequate, with two exceptions. Not since 1987 has a dermatologist seen inmates, despite testimony that the need continues. A dermatologist should be added to the referral staff.

In addition, in contrast to basic medical care standards, no cardiologist regularly visits the institution. We credit Dr. Cohen's testimony pointing out discrepancies in electrocardiogram interpretations. Dr. Cohen opined that readings pronounced "normal" by Dr. Snitzer did, in fact, show abnormalities. A cardiologist should be retained to examine periodically those inmates identified as having cardiovascular disease. We suggest that the cardiologist undertake interpretation of the electrocardiograms.

Problems in the infirmary center around a lack of space, unsanitary conditions, inadequate staffing and deficiencies in equipment and supplies. SCIP officials anticipate that a new infirmary will be built; however, no date has been set for commencing construction. In the meantime, the administration plans to open a temporary modular infirmary soon. We toured the new unit before it was finished, and we generally approve the facilities; however, as we have previously stated, the new infirmary is smaller than the old one. The size poses a difficulty when we consider that the old infirmary, intended for approximately 18 patients, often was over-extended to accommodate 29. We conclude that haste in building the new permanent infirmary is essential.

Inadequate infirmary care related to staff takes predominantly two forms: medical rounds are cursory and medical records are incomplete. Dr. Cohen testified that Dr. Snitzer spends no more than one minute per patient on rounds. He generally does not visit the psychiatric patients, although the testimony showed that they often have medical illnesses requiring a doctor's care. Perhaps as a result of his crowded schedule, Dr. Snitzer does not inquire after symptoms; thus, some diseases remain undiagnosed and some complaints undiscovered. Also, presumably in part because of time pressures, Dr. Snitzer does not record details of his visits in the inmates' medical charts. We are optimistic that these problems will be resolved once the Commonwealth has provided for additional physician hours.

Nearly all problems with the delivery of medications to inmates are directly traceable to a lack of personnel. Overworked nurses shortcut good nursing practice. Mr. Brewer testified about the stress involved in dispensing drugs for too many inmates in too many places. Because nurses cannot take time to watch inmates ingest drugs, suicidal inmates obtain opportunities to hoard dangerous drugs. Especially questionable is the practice that day nurses administer insulin which has been prepared by the night nurse. We also heard testimony that Mr. Morrash, although unlicensed, recommends medications for patients and gives and/or takes orders for prescription medications.

Nurses also must give medications to the masses without properly identifying inmates and often do not have time to chart the medication on the Medication Administration Record. As a result, patients either may be denied a medication or, if upon request the nurse decides to provide it, the inmate accidentally may receive a double dose.

The plan should provide for enough nurses on each shift to follow good medical and nursing practice in dispensing medications, including proper preparation and delivery of the drug, identification of the patient, and recording of all medications. In addition, only licensed physicians or nurses should be involved in medication procedures.

Inmates are entitled to constitutionally adequate emergency as well as routine care. Emergency services have taken on a hit-or-miss character at SCIP. Mr. Belfonti discovered that the institution does not have an emergency plan for evacuating inmates by stretcher. Even though nurses

must respond to block emergencies about 2 times a week, the nursing department is unprepared to handle the emergency and at the same time, cover serious concerns in the infirmary. Mr. Morrash admitted that he exceeds his administrative capacity and overlaps a nursing function by referring inmates to outside hospitals. Although Mr. Morrash insinuated that personnel can respond effectively to emergencies because "everyone helps out," we fear this haphazard approach invites disaster.

Prison authorities should appoint someone to formulate and supervise a plan for medical emergencies; the plan should provide for mock disaster drills.

Ms. Shoaf and Ms. Esposito testified about the condition of equipment and the lack of supplies at SCIP. We view the condition of these items as symptomatic of the general disorganization and lethargy apparent in the nursing department and the administration. At some point, a lack of concern for the state of supplies and equipment amounts to deliberate indifference to serious medical needs because patients cannot receive proper care without such furnishings. However, Ms. Boyle and Mr. Morrash reported that supplies are more or less available and that equipment problems stem from nurses' technical ignorance. Allowing defendants the benefit of the doubt in this case, we are optimistic that additional nurses and improvements in the organization of the nursing department will lead to upgrading inventories and machinery.

As earlier described, we received testimony about specific inmate patients. Plaintiffs attempted to show that defendants were deliberately indifferent to each prisoner's medical needs and defendants asserted that they were not.

Initially, we caution that we are not trying a negligence case here, and moreover, the evidence presented as to each inmate is insufficient for us to do so.

"Mere negligence in diagnosing or treating a medical condition ... is not a constitutional violation simply because the patient is a prisoner." *White v. Farrier*, 849 F.2d 322 (8th Cir.1988) (citing *Estelle v. Gamble*, 429 U.S. at 106, 97 S.Ct. at 292). *See also Smith–Bey v. Hospital Administrator*, 841 F.2d 751, 759 (7th Cir.1988) (negligence, or even tort recklessness, does not state a claim under the eighth amendment).

Physicians are entitled to exercise their medical judgment. Although one physician may diagnose a condition differently than another, this alone will not establish deliberate indifference. *White*, 849 F.2d at 327. Furthermore, although a prisoner has a right to some kind of medical treatment, he does not have a right to any particular type of therapy, provided that a therapy option is available. *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir.), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). We will defer to the informed judgment of prison officials as to an appropriate form of medical treatment. But if an informed judgment has not been made, the court may find that an eighth amendment claim has been stated. *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir.1986).

We find that the evidence about specific inmate patients presents a borderline case for deliberate indifference. Quite obviously, prisoners at SCIP are not receiving a quality of care consistent with modern medical science. For example, we can understand that routine chest x-rays may not be "medically rewarding" for most new admittees. However, we question medical judgment when x-rays are not ordered for new inmates with histories of heart or chest disease. We also must question practices regarding diabetic inmates for whom laboratory testing and insulin administration are not timely accomplished.

Of special concern in the prison context is the apparent nonchalance about the possible prevalence of AIDS. AIDS is "a real and potentially devastating problem within the prison system." Comment, *Sentenced to Prison, Sentenced to AIDS: The Eighth Amendment Right to be Protected from Prison's Second Death Row*, 92 Dick.L. Rev. 863, 876 (1988). We have had extensive testimony about drug addiction and homosexuality in the prison population; yet, defendants assert that they have iden-

tified only two cases of AIDS at the institution. It is difficult to believe that more cases do not remain insidiously undetected.

We are uncomfortably aware that inmate HF slipped through the cracks, failing to receive effective medical attention, partly because prison personnel were inadequately trained to recognize the signs and symptoms of AIDS-related illness. HF's medical record revealed that he suffered from a skin problem, upper respiratory infections, fever, chills and startling weight loss, all indications of AIDS.

Regardless whether two physicians would disagree about the treatment of such a person, we believe that more could have been done to identify the disease, both for HF's sake and for the benefit of the entire prison population. When prison officials have refused even to recognize that such a problem exists, the court is well within its province to intervene. *Id.* We will therefore expect that the medical department devise a protocol to train medical, nursing and corrections personnel to recognize signs and symptoms of illnesses associated with AIDS.

### 3. Dental Services

Plaintiffs' witness testified that inmates must await dental services for as much as a year, regardless of the seriousness of the condition. Deputy Wigton stated that he has requested an additional dentist, 2 dental hygienists and clerical support for the dental department. Moreover, Deputy Wigton noted that the Table of Organization currently provides for these positions.

We note that delays in providing dental services can result in "continued and unnecessary pain and loss of teeth." *See Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987) (quoting *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981)), *cert. denied,* ― U.S. ――, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). We will therefore want the plan to consider filling the positions already identified on the Commonwealth's Table of Organization. In addition, the plan should in-

quire after dental staffing needs as it pertains to the present population in the survey suggested for the psychiatric and medical departments. Should the plan show that additional personnel are required to serve inmates' serious dental needs, we will order that the appropriate persons be hired.

### IX.

### PRISON MONITOR

The task of maintaining liaison with counsel, the various parties and the staff of the institution will be too great for the court by itself. We have been satisfied with receiving reports and consulting with a monitor in the case of *Owens–El v. Robinson*, 457 F.Supp. 984 (W.D.Pa.1978). That case involved the Allegheny County (Pittsburgh) Jail, in which we considered many allegations similar to those asserted here.

We will appoint an individual to serve as prison monitor in this case, that person to be paid by defendants.

### X.

### CONCLUSION

The State Correctional Institution at Pittsburgh is constitutionally inadequate in many ways. As we have repeatedly stated in this Opinion, we are well aware that, except as a last resort, a court should not substitute its judgment, nor insinuate itself into the administration of an institution. Indeed, we have no desire to do so. Having spent much of the last 13 years dealing with the Allegheny County Jail, we are not inclined to want to supervise SCIP for the next 13 years. *See Owens–El v. Robinson, supra,* and its numerous progeny.

A parenthetical word should be said about the medical/mental health services at SCIP. In this Opinion we have discussed those services (or lack thereof) in some detail.

It is ironic that there is such dire medical need in an institution which is located in a metropolis boasting some of the finest medical facilities in the world and also having an outstanding school of medicine.

Perhaps appropriate officials of the Commonwealth and the institution should approach the University of Pittsburgh and the leaders of the medical community to form a team to look at the medical problems of SCIP.

As public hospitals have disappeared, the training ground for medical students, interns and residents that they provided has gone with them. Working in a penal setting would be an educational and enlightening experience for these students and doctors and should likewise work to the advantage of SCIP.

We believe that giving SCIP officials and the members of its various professional staffs an opportunity to present and implement their own solutions to these difficult problems will be consistent with the spirit of the federal court decisions dealing with prison conditions.

An appropriate Order will issue.